**BOSTON AND MAINE RAILROAD**
et al., Plaintiffs,

v.

**UNITED STATES** of America et al.,
Defendants.

Civ. A. No. 60–475.

United States District Court
D. Massachusetts.

Feb. 8, 1962.

James Garfield, Brinley M. Hall, Conrad W. Oberdorfer, Boston, Mass., J.

Raymond Clark, Philadelphia, Pa., Joseph F. Eshelman, Philadelphia, Pa., R. G. Bleakney, Jr., Boston, Mass., Richard J. Ferriter, Boston, Mass., Kenneth H. Lundmark, New York City, for plaintiffs.

Earle C. Cooley, Boston, Mass., James D. St. Clair, Boston, Mass., W. L. Grubbs, Louisville, Ky., R. W. Henriott, Louisville, Ky., J. L. Lenihan, Louisville, Ky., for Louisville and Nashville Railroad Company (L & N) and Atlantic Coast Line Railroad Company (Coast Line), intervening defendants.

Robert W. Ginnane, General Counsel, Washington, D. C., for Interstate Commerce Commission, intervening defendant.

W. Arthur Garrity, Jr., U. S. Atty., James W. Noonan, Asst. U. S. Atty., Boston, Mass., Robert A. Bicks, Asst. Atty. Gen., Washington, D. C., for the United States.

Before HARTIGAN, Circuit Judge, and FORD and JULIAN, District Judges.

JULIAN, District Judge.

This action is brought, and the jurisdiction of this Court is invoked, under 28 U.S.C. §§ 1336, 1398, 2284, and 2321–2325, to enjoin, set aside, annul, and suspend the order of the Interstate Commerce Commission of January 28, 1960, entered in Docket No. 32055, Louisville & Nashville Railroad Co. et al. v. Akron, Canton & Youngstown Railroad Co. et al., 309 I.C.C. 491.

The plaintiffs are the Boston and Maine Railroad and forty-six other railroads,[1] and the New York Central Railroad Company (N. Y. C.), the intervening plaintiff.

The United States of America is made defendant under the authority of 28 U. S.C. § 2322. The Interstate Commerce Commission, Louisville and Nashville Railroad Company (L & N), and Atlantic Coast Line Railroad Company (Coast Line) are intervening defendants.

The plaintiff and defendant railroads are common carriers of property and are subject to Part I of the Interstate Commerce Act (49 U.S.C.A., chapter 1).

The Commission's order of January 28, 1960, in Docket No. 32055, that is here under attack by the plaintiffs, requires L & N and Coast Line, the complainants before the Commission, and all the northern railroads, including the plaintiffs, defendants in the proceeding, to establish and apply divisions [2] of joint all-rail class and commodity rates (except those on coal and on coke made from coal) [3] between the points named in the complaint [4] therein and points in official territory on the same basis of divisions as was established by the Commission in its Docket No. 29885, Official-Southern Divisions, 287 I.C.C. 497, and 289 I.C.C. 4.

For railroad freight rate purposes the United States is divided into "territories." The two territories involved in

---

1. These are listed in Appendix A of the amended complaint.

2. A division may be defined as that portion of revenue which each railroad or group of railroads (e. g., southern or northern railroads) participating in a joint rate receives for its services in transporting freight.

3. Coal, and coke made from coal, were excepted by common consent from this and prior investigations.

4. Paragraph II of the complaint in Docket No. 32055:
   "(1) Between Louisville, Ky., Evansville, Ind., Henderson, Ky., Paducah, Ky., and Cincinnati, Ohio (including Covington and Newport, Ky.), on the one hand, and points on northern and eastern lines, as more fully described in Official-Southern Divisions, 287 I.C.C. 497, 498, and Class Rate Investigation, 1939, 262 I.C.C. 447,

457, on the other hand, over routes in part through southern territory.
   "(2) Between points on the Atlantic Coast Line Railroad in Official territory in Virginia between Richmond and Petersburg, inclusive; between Norfolk and Suffolk, inclusive; between Bruce and Marford, inclusive, and Jarratt, on the one hand, and, on the other hand, points on northern and eastern lines, as described in Paragraph II(1) herein."
   The complaint in 32055 alleges (paragraph IV) "that the divisions of the involved rates are, and for a long time have been a source of dissatisfaction, trouble, and dispute between complainants and defendants." The defendants therein admit in their answers "that during the last several years there have been discussions without result between representatives of the complainants and the defendants relating to the divisions here involved."

this case are "eastern" or "official" territory, and "southern" territory. They were defined by the Commission in its report in Class Rate Investigation, 1939, 262 I.C.C. 447, 457.[5]

The plaintiffs are northern railroads. The defendants, L & N and Coast Line, are southern railroads.

The present dispute had its origin in the order entered in 1953 by the Commission in Docket No. 29885. In that proceeding, after a general investigation of primary divisions on most of the official-southern interterritorial traffic, the Commission found that "the present primary divisions of joint all-rail class and commodity rates (except those on coal and coke made from coal) between official and southern territories are unjust, unreasonable, and inequitable" and prescribed a new divisional basis on interterritorial traffic between the two territories. All the northern and southern railroads were parties to the proceedings in Docket No. 29885. Thereafter a disagreement arose between the northern and southern lines as to whether the order applied to the rates on traffic moving to and from the border points.[6] The northern lines claimed that it applied on such traffic moving between the border points and the South, and the southern lines asserted that it applied on such traffic moving between the border points and the North. In its supplemental report of March 5, 1956, 298 I.C.C. 83, the Commission interpreted its decision of 1953 as requiring the use of the 29885 basis of divisions on border-point traffic to and from the South but not on similar movements to and from the North, and gave the following reasons (page 84):

"The instant proceeding [Docket No. 29885] was instituted for the purpose of reviewing the divisions prescribed in No. 24160, and it was generally understood by the parties that the two proceedings were identical in scope except that divisions of lumber rates omitted from the former proceeding were included in this one. Up to the present time there has been no suggestion that divisions of intraterritorial rates within official territory were in any way involved in this proceeding.

5. Official territory lies generally north of the following line: The Ohio River from its mouth, including south-bank river crossing points on official territory traffic to Cincinnati, Ohio, thence east on the line of the Chesapeake & Ohio Railway to Kenova, W. Va., thence on the main line of the Norfolk and Western Railway to its crossing with the line of the Virginian Railway* west of Roanoke, Va., thence on the Virginian Railway to Suffolk, Va., thence on the main line of the Norfolk and Western to Norfolk, Va., including also all lines of the Chesapeake & Ohio in Kentucky and all lines of the Norfolk & Western except those extending south from Roanoke, Va., to Winston-Salem, N. C., and from Brookneal, Va., to Durham, N. C. Southern territory lies south of official territory and east of the Mississippi River but includes north-bank Ohio River crossings, such as Cincinnati, on southern territory traffic.

* The Virginian Railway Company has since been merged with Norfolk & Western.

6. Border points are generally those points on the dividing line between official and southern territory which for rate-making and rate-division purposes are deemed to be in official territory on traffic to and from the North, and in southern territory on traffic to and from the south. The border points involved here are the following (see also footnote 4 above):

| L & N | COAST LINE |
|---|---|
| Louisville, Ky. | Richmond to Petersburg, Va., inclusive |
| Evansville, Ind. | Norfolk to Suffolk, Va., inclusive |
| Henderson, Ky. | Bruce to Marford, Va., inclusive |
| Paducah, Ky. | Jarratt, Va. |
| Cincinnati, Ohio, including Covington and Newport, Ky. | |

"The southern lines' 'position is that if intraterritorial traffic moving between the border points described and the South is within the scope of the Commission's order in docket No. 29885, then such border point traffic moving to and from points in the north is likewise within the scope of those orders.' The position is untenable for the reason that the divisions of the southern intraterritorial rates were before us to the extent before indicated, while those of the intraterritorial rates in official territory were not.

"In the petition of the northern lines they point out that the southern lines have refused to join in establishing the prescribed basis of divisions to rates between Cincinnati, Ohio, for example, as well as certain other border points, and southern territory when the northern lines participate in the movement by way of Louisville, Ky. In our opinion these divisions are subject to the order in this proceeding, as they were also to that in No. 24160. * * * "

The result was that on traffic moving between border points and points in southern territory over an official territory line the 29885 divisions [7] applied, whereas on similar traffic moving between border points and points in official territory over a southern line the divisions were made on a mileage prorate basis [8] which gave southern carriers smaller divisions for comparable distances than were received by northern carriers.

Thereupon, three of the southern carriers, namely, L & N, Coast Line, and the Nashville, Chattanooga & St. Louis Railway Company,[9] on September 4, 1956, commenced these proceedings (No. 32055) by filing a complaint with the Commission in which they sought the application of the 29885 basis of divisions to their border-point traffic moving to and from the North.

In view of the plaintiffs' claim that they were not accorded a full hearing by the Commission, the proceedings before that body will be described in greater detail than would otherwise be necessary.

The Commission assigned the complaint for hearing before one of its examiners. Hearings began in February, 1957, and were concluded in February, 1958. The plaintiffs were accorded a full opportunity to present their defense by oral and documentary evidence, to submit rebuttal evidence, and to cross-examine witnesses.[10] The evidence received at the hearings is contained in 823 pages of transcript and 131 exhibits, many of them of great length, consisting of massive tabulations of statistics relating to movements of traffic, costs, revenues, and divisions of joint

---

7. The No. 29885 division of rates is based upon prorating factors consisting of a scale of integers arranged by distances designed to reflect numerically the relative value of the transportation service rendered by the participating railroads to and beyond the dividing point. The integers are used to construct percents to be employed in dividing joint rates. The divisions prescribed by the Commission in No. 29885 were established in that manner. An integer of 12 is assigned for each 50 miles or fraction of 50 miles of line-haul service, and an integer of 53, equivalent to 221 miles, is assigned for terminal service at the point of origin, destination or interchange. Terminal service customarily consists of the switching of cars in the terminal area.

8. Mileage prorate is a system of dividing rates whereby each railroad participating in a joint rate receives a share determined by the ratio of its miles of haul to the total miles of the haul from point of origin to point of destination.

9. The Nashville, Chattanooga & St. Louis Ry. Co. was merged with the L & N during the proceedings before the Commission.

10. The Administrative Procedure Act, 5 U.S.C.A. § 1006(c) provides: " * * * Every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. * * * "

rates both on the present and 29885 bases. The examiner received briefs from the parties in April, 1958, and filed his proposed report in January, 1959. The report was favorable to L & N and Coast Line.

In March, 1959, the northern railroads, including the plaintiffs, filed exceptions to the proposed report. The brief containing the exceptions consisted of 132 printed pages and set forth, with detailed supporting arguments and citation of authorities, two general exceptions with subdivisions and 62 specific exceptions. At the same time supplemental exceptions were filed with the Commission by the New York Central (34 pages) and the Detroit, Toledo & Ironton Railroad Co. (31 pages). The briefs filed by these two plaintiffs also contained the arguments in support of their exceptions.

In their principal exceptions-brief the plaintiffs requested "the privilege of oral argument."

In April, 1959, L & N and Coast Line filed a lengthy brief (132 printed pages) replying in detail to the plaintiffs' contentions.

On June 1, 1959, the Commission denied the plaintiffs' request for oral argument, "it appearing," said the Commission, "that the matters involved are sufficiently presented in the record and that oral argument in addition thereto is not necessary."

On June 20, 1959, the Commission, in response to a petition of the northern lines, reopened Docket No. 29885.

On September 28, 1959, the plaintiffs filed an 18-page petition for consolidation of the proceedings in Docket No. 32055 (the instant case) with Docket No. 29885 and for oral argument. Again, this petition contained extended arguments. L & N and Coast Line filed a reply in opposition. The Commission denied the plaintiffs' petition on November 23, 1959.

The Commission filed its report and entered the order now under attack on January 28, 1960. The report is found in 309 I.C.C. 491.

On March 7, 1960, the northern railroads filed a 52-page "general petition" to reopen the proceedings for oral argument and reconsideration. On the same date the Detroit, Toledo & Ironton Railroad Co. (one of the plaintiffs) filed a 17-page supplemental petition for modification of the report, and the N.Y.C. (also a plaintiff) filed a 24-page supplemental petition for reconsideration and oral argument. There was a 29-page reply to these petitions by L & N and Coast Line on March 28, 1960.

By order dated May 6, 1960, the Commission denied the petitions for reconsideration.

The Commission's order now under review became effective on July 18, 1960.[11]

The plaintiffs attack the validity of the order on these principal grounds:

1) The order was not made "after a full hearing" as required by the statute in that the Commission refused to hear oral argument.

2) The Commission failed to make the finding as required by statute that the present divisions of joint rates are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto.

3) The Commission failed to prescribe the just, reasonable, and equitable divisions "to be received by the several carriers" as required by statute.

4) The Commission failed to give "due consideration" to the statutory elements that go to relative service costs.

5) The Commission, contrary to statutory and constitutional requirements, based its order not on the record in the proceedings before it, but upon its earlier conclusions in No. 29885.

It is argued by the plaintiffs that the order should be annulled because it was

---

11. On July 15, 1960, an order was entered restraining the enforcement of the Com- mission's order until further order of this Court.

not made "after a full hearing" as required by the statute and the Constitution in that the Commission refused to hear *oral* argument.[12]

■■ There is nothing in the Interstate Commerce Act, the Administrative Procedure Act, the Commission's General Rules of Practice, or in Fifth Amendment to the Constitution of the United States which entitles the plaintiffs to oral argument in addition to written argument. Section 15(6) of the Interstate Commerce Act (49 U.S.C.A. § 15(6)) states only that the Commission "after a full hearing upon complaint" may prescribe just, reasonable and equitable divisions. In The New England Divisions Case, Akron, C. & Y. R. Co. v. United States, 1923, 261 U.S. 184, 200, 43 S.Ct. 270, 277, 67 L.Ed. 605, Mr. Justice Brandeis defined a full hearing as

" * * * one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the step asked to be taken."

In Morgan v. United States, 1936, 298 U.S. 468, at page 481, 56 S.Ct. 906, **at** page 912, 80 L.Ed. 1288, it was stated:

"Argument may be oral or written. The requirements are not technical."

See also N. L. R. B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 350–351, 58 S.Ct. 904, 82 L.Ed. 1381; Federal Communications Commission v. WJR, 1949, 337 U.S. 265, 267, 69 S.Ct. 1097, 93 L.Ed. 1353; American Broadcasting Co., Inc. v. Federal Communications Commission, 1949, 85 U.S.App.D.C. 343, 179 F.2d 437, 442; and National Labor Relations Board v. Clausen, 3 Cir., 1951, 188 F.2d 439, 444.

On the subject of oral argument, the Commission's General Rules of Practice (49 C.F.R.), established by the Commission pursuant to 49 U.S.C.A. § 17(3), read as follows (section 1.98):

*"Oral argument before Commission—*

*"(a) Request; how made.* If no officer's report is to be served, request for oral argument before the Commission must be made at hearing or by letter (original only need be filed with the Commission) within 10 days after the hearing. If an officer's report is to be served, the request for oral argument must be included as part of the exceptions brief or reply thereto.

*"(b) Request for time allotment.* If the petition is granted a notice will be served by the Commission upon the parties setting the date for the oral argument. At least 10 days before that date any party desiring to participate in the oral argument must make request by letter (original only need be filed with the Commission) for an allotment of time. Only those making request in this manner will be permitted to participate."

The Commission has construed this rule to mean that the "granting of oral argument in proceedings such as this is discretionary with the Commission." C. B. Fleet Co., Inc., v. Aberdeen & R. R. Co., 1952, 287 I.C.C. 89.

A reading of the exhaustive briefs filed by the plaintiffs with the Commission before the order was entered clearly discloses that the plaintiffs fully exploited the ample opportunities granted them by the Commission to present, in writing, all their arguments in support of their own

---

12. In their brief (p. 50) the plaintiffs state their position as follows:

"The plaintiffs do not contend that, in the absence of any statutory requirement, rule, or fixed practice, the granting of oral argument is a constitutional prerequisite to the validity of an otherwise unobjectionable hearing. They do contend that the arbitrary element inherent in a sudden and previously unannounced reversal of a settled administrative course of conducting hearings vitiates the administrative action even if the aspect of the hearing involved were one which the administrative agency was not bound by Constitution or statute to observe in the first instance."

**670**

views and in opposition to the claims of L & N and Coast Line.

In reply to a question from the Court, counsel for the plaintiffs stated that it was doubtful that anything would have been said orally that was not stated to the Commission in writing. (Transcript of hearing, p. 43.)

We are of the opinion that in these circumstances the granting of an opportunity for oral argument in addition to full written argument was a matter within the sound discretion of the Commission. We find no merit in the plaintiffs' contention that the denial of their request for oral argument constituted an arbitrary reversal of the Commission's alleged "settled administrative course of conducting hearings" which rendered the Commission's order invalid.

We proceed to a review of the Commission's findings of fact and ultimate conclusions. The applicable standards of judicial review are found in the Administrative Procedure Act, 5 U.S.C.A. § 1009(e),[13] which provides, to the extent here pertinent, that the reviewing court shall

"hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * * (5) unsupported by substantial evidence in any case * * * reviewed on the record of an agency hearing provided by statute * * *. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error."

The Supreme Court in Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, has interpreted section 1009(e) to require affirmance of the find-

ings of an administrative agency if, taking the record as a whole, they are supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." It has further been held that the Administrative Procedure Act has not altered the rule of administrative finality. Baltimore Transfer Co. v. I. C. C., 1953, D.C.Md., 114 F.Supp. 558, 564, affirmed in 346 U.S. 890, 74 S.Ct. 225, 98 L.Ed. 394 (1953). The courts will not examine the findings of fact further than to determine whether there was substantial evidence to sustain them. Interstate Commerce Commission v. Union Pacific R. R., 1912, 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308. If the evidence was substantial, then the Commission alone is authorized to decide upon its weight or the significance of the facts. Baltimore & Ohio R. Co. v. United States, 1936, 298 U.S. 349, 358, 56 S.Ct. 797, 80 L.Ed. 1209. The Commission's order is the product of expert judgment which carries a presumption of validity. "And he who would upset the * * * order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." I. C. C. v. Jersey City, 1944, 322 U.S. 503, 512, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420. The administrative body was created for the purpose of using its judgment and its knowledge. National Labor Relations Board v. Seven-Up Bottling Co., 1953, 344 U.S. 344, 348, 73 S.Ct. 287, 97 L.Ed. 377. While presumed valid, however, the order may be annulled if shown to rest on a misconstruction of the Act or upon inadequate or unsupported findings of fact. Baltimore & Ohio R. Co. case, supra, 298 U.S. at page 358, 56 S.Ct. 803. The Commission's "expertise is not sufficient by itself. Findings supported by substantial evidence are required." I. C. C. v. J-T Transport Co., 368 U.S. 81, 82 S.Ct. 204, 216,

13. The Attorney General's Manual on the Administrative Procedure Act, 1947, states, at pp. 93 and 108:
"The provisions of Section 10 constitute a general restatement of the princi-

ples of judicial review embodied in many statutes and judicial decisions.
*　　*　　*　　*　　*
"[Sec. 10(e)] restates the present law as to scope of judicial review."

7 L.Ed.2d 147, (Dec. 4, 1961). The function of the court is to review the administrative action, not to determine whether the "court on the evidence would have reached the same result as did the Commission." Old Colony Furniture Co. v. United States, 1951, D.C.Mass., 95 F. Supp. 507, 509. The judicial function is exhausted when there is found to be a rational basis for the conclusion approved by the administrative body. Mississippi Valley Barge Line Co. v. United States, 1934, 292 U.S. 282, 286, 54 S.Ct. 692, 78 L.Ed. 1260.

■ The Commission's failure in many instances to draw a clear line of demarcation between findings of fact[14] and summaries, analyses and discussion of the evidence has contributed heavily to the difficulty of reviewing this case. It is to be noted that the Commission "is required to make not only findings that support its decision * * * but also findings that are intelligible and complete." Concurring Opinion of Mr. Justice Douglas in United States v. Drum, 82 S.Ct. 408, Jan. 15, 1962.

14. Section 8(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1007(b) provides:
"* * * All decisions * * * shall * * * include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; and (2) the appropriate rule, order, sanction, relief, or denial thereof."

15. Transcript of hearing, p. 49:
"Mr. J. Raymond Clark [counsel for the plaintiffs] * * * I would like to make it plain at the outset, however, that plaintiffs do not here ask this Court to undertake to resolve disputed issues of fact. We are prepared to demonstrate that indeed the Commission's report is deficient in many respects with respect to findings of fact. Substantial errors and omissions will necessarily appear in the course of my very brief description of the record. Nevertheless, we do not press our objections to the Commission's errors and omissions with respect to findings of fact. We are content to ask the Court to examine the report of the Commission, to take it at its face value, if you will * * *."

■ Despite its deficiencies,[15] we believe that the report contains sufficient findings of fact to enable the Court to perform the task assigned to it on review.

The Commission's findings may be summarized as follows:

On interterritorial traffic between official and southern territories the joint rates are divided on the 29885 basis of divisions (see footnote 7, supra). On traffic moving between border points and the South over an official-territory line, the 29885 basis also applies, whereas on similar traffic moving between border points and the North over a southern line, the divisions are on a mileage prorate basis (see footnote 8, supra). As a result, the southern carriers receive smaller divisions for comparable distances than the northern carriers.

The division of joint rates on a mileage prorate basis is unreasonable in instances where carriers perform a short haul as compared with the haul of the other participating carriers.[16]

16. The Commission has found that the division of revenue on mileage prorate is an unreasonable basis for dividing joint rates in instances where carriers perform a short haul as compared with the haul of other participating carriers because it gives too little consideration to the fact that freight rates must cover terminal and interchange services as well as line-haul operations. Thus, in Southwestern-Official Divisions, 234 I.C.C. 135 (decided in 1939) the Commission stated, at page 140:
"* * * we are of the view that a mileage prorate does not afford fair divisions where there are wide differences in the lengths of haul in respective territories."
And at page 161:
"* * * but since there was a difference of about 250 miles in the average hauls in the two territories a mileage prorate is not a proper criterion."
In the oral argument before the Court the plaintiffs conceded that in a short haul terminal expense is relatively heavy, while in a long haul terminal expense is relatively less burdensome. (Transcript of hearing, p. 8.)

The L & N's average haul is 124 miles and that of the plaintiffs is 472 miles. On the Coast Line traffic the distances vary from 8 to 53 miles as compared with an average of 439 miles for the northern railroads. Thus the line hauls of the L & N and Coast Line are relatively short when compared with those of plaintiffs, and the present divisional basis gives too little consideration to the fact that freight rates cover terminal and interchange services as well as line-haul operations.

Approximately 93 per cent of the L & N's traffic [17] involved in this proceeding originates or terminates at Louisville and about 85 per cent of such traffic moves to or from Louisville through Cincinnati. L & N's costs at these two terminals, which are situated at either end of a comparatively short haul of 110 miles, are higher than those at its other terminals. The operating cost per car (loaded or empty) at Louisville is $4.46, and at Cincinnati $2.87. At L & N's four other major terminals the costs per car range from $1.23 to $2.64, the average for the six terminals being $2.52. Because of the high cost of switching and interchanging of cars and the cost of using and maintaining bridges, the Louisville terminal is L & N's most expensive to operate, and Cincinnati its second most expensive.

L & N's carload traffic here involved represented about 7.6 per cent of its total manufactures and miscellaneous traffic for 1955 but produced only 3.6 per cent of its total revenue from that source. Moreover, although it represented 2.3 per cent of all carload traffic handled by the L & N, it produced only 1.5 per cent of L & N's total freight revenues. This was due to L & N's failure to obtain the divisions of revenue on the 29885 basis.

As compared with the total carload traffic moved by Coast Line in 1955, the carloads here involved constituted 0.4 per cent of its total traffic but produced only 0.18 per cent of the total freight revenue, although the average rate on the border point traffic is higher than the average rate for all its freight.

During the period from 1946 through 1955 L & N and Coast Line expended very large sums for modern equipment and for other improvements on their lines which contributed to more efficient operations. By these and other means described on pages 499 and 501 of the Commission's report, L & N and Coast Line have in recent years improved their operations in relation to those of the plaintiffs, despite the fact that the principal plaintiffs enjoy a greater density of traffic on their lines which affords them greater opportunities for handling heavier trains with resulting economies.

The Commission found that the position of the L & N and Coast Line on traffic from border points to the North is not materially different from that of the plaintiffs on traffic from border points to the South when the 29885 basis was established with reference to the latter traffic in the Official-Southern Divisions Case, supra.

The 29885 basis would give L & N and Coast Line no greater revenue than the plaintiffs now receive on border-point traffic to the South moving under similar circumstances.[18]

17. The bulk of the traffic with which this case is concerned falls within the manufactures and miscellaneous group and has a high rate level as compared with coal and other commodities of lower grade.

18. There is abundant evidence in the record to sustain this finding. One example is a typical movement of a carload shipment of tractors weighing 40,269 pounds from Louisville, Ky., to New York, N. Y., via L & N to Cincinnati, 110 miles (short line and actual car miles) and from Cincinnati to New York via B & O, a northern carrier, 724 miles, short line (756 actual car miles). The total revenue was $293.96. Under present divisions L & N received $42.16 and B & O $251.80. On a like carload shipment from Cincinnati, Ohio, to New Orleans, La., via B & O to Louisville, Ky., 110 miles, short line (129 actual car miles), and from Louisville to New Orleans via L & N 746 miles, short line (807 actual car miles), out of a total revenue of $293.96 B & O would receive

From a station on the L & N in southern territory only 21 miles west of Louisville, the revenue derived from a carload of furniture on an *interterritorial* shipment would be $73.80 on the applicable 29885 basis, which is the same as the northern lines now receive on their border point movements to the South. The 29885 basis is also presently applied to an interterritorial shipment from a station five miles east of Louisville through which Louisville traffic must pass on its way to Cincinnati. (See Commission's report, page 494.)

The Coast Line stations between Petersburg and Jarratt, both interchange points, are now subject to the 29885 basis, although Jarratt and Petersburg themselves are not. (See Commission's report, page 496.)

Still another example of inequality in divisions is given in the Commission's report at page 497. Under present divisions Coast Line receives 22 per cent of the rate applying between Jarratt and New York after first deducting the New York terminal charge which accrues to the northern lines. From Emporia, Va., a point in southern territory, immediately south of Jarratt on the Coast Line and only nine miles more distant from Richmond, the gateway, the Coast Line receives 36 per cent under the applicable 29885 basis. The Commission finds that this inequality exists also in connection with the other border points.

The Coast Line stations occupy a geographic position in official territory similar to that of the Norfolk & Western stations south of the border in Virginia and North Carolina, and also similar to certain of the Chesapeake & Ohio stations in southern territory which now enjoy the 29885 basis of divisions.

The Commission found that the 29885 basis of divisions accords appropriate recognition to the relatively short hauls of the L & N and Coast Line, and to the terminal costs which, especially on the L & N at Louisville, are relatively high.

The Commission considered the average rates of return for the eastern carriers and for L & N and Coast Line. It concluded that since the issue in this case concerns only a small segment of the carriers' traffic over a fractional part of their lines, comparisons of rates of return were not controlling.[19]

under the applicable 29885 basis of divisions the amount of $82.31 as its share of the joint rate, and L & N's share would be $211.65. The transportation service performed by L & N in the shipment to New York is substantially the same as that rendered by B & O in the shipment to New Orleans, yet L & N under present applicable divisions receives only $42.16, while B & O receives $82.31 on the 29885 basis. The Commission's order would give L & N the same share of the joint rate that is now being given to B & O for substantially the same services. (See Exhibit 2, page 64, and Exhibit 3, page 8.)

A similar example is given in the Commission's report, 309 I.C.C. 491, 494. There the Northern carrier is the New York Central.

19. Based on a study of the traffic movements between the border stations of the L & N and official territory, it was estimated that the L & N's share of the annual revenue under the 29885 basis would be increased by approximately $1,250,000 on carload traffic plus an eventual $50,000 to $60,000 per year on less-than-carload traffic. On the basis of a similar traffic study, it was estimated that Coast Line's revenues would be increased annually by approximately $140,000. The combined operations of these two roads represented about 30 per cent of the total rail miles operated by the Class I railroads in southern territory during the period 1950 through 1955. During these same years their share of the total revenues of the railroads in southern territory dropped from about 29 per cent in 1951 to 26 per cent in 1955. There was evidence that the increase of $1,300,000 per year in revenue estimated to accrue to the L & N under the prescribed 29885 divisions amounts to about 18/1000 of 1% of the total revenue of the northern railroads. The estimated increase of $140,000 per year to the Coast Line amounts to 2/1000 of 1% of the northern railroads' total revenues. There was also evidence that the estimated increased revenue of the L & N would have reduced the rate of return for the northern railroads in 1955 from 4.1896 per cent to 4.1842 per cent,

■ All the foregoing findings of the Commission are supported by substantial evidence.

■ The plaintiffs assert that in prescribing 29885 divisions the Commission failed to make the finding, prerequisite under section 15(6), that the existing divisions are or will be unjust, unreasonable, inequitable or unduly preferential or prejudicial as between the carriers that are parties thereto. In addition to this assertion N.Y.C. contends that the Commission failed to prescribe the just, reasonable and equitable divisions "to be received by the several carriers" as required by section 15(6).[20]

In the Baltimore & Ohio Railroad case, supra, the Supreme Court stated, 298 U.S. at page 356, 56 S.Ct. at page 802:

"The prescribing of divisions is a legislative function. Exertion of that power by the Commission is conditioned upon its finding after a full hearing that the divisions then in force do not, or in the future will not, comply with the specified standards."

The Commission met this requirement by making the following ultimate findings (page 511 of its report):

"We find that the present primary divisions of joint all-rail class and commodity rates (except those on coal, and on coke made from coal) between the points named in the complaint and official-territory points are and for the future will be unjust, unreasonable, and inequitable; and that just, reasonable, and equitable primary divisions of the rates will be divisions determined on the 29885 basis * * *."

Since the only divisions involved in the proceedings were primary divisions between L & N and Coast Line on the one hand, and the plaintiffs on the other, the findings could be given no other reasonable meaning than that the present divisions of the joint rates applicable to the traffic here involved are and for the future will be unjust, unreasonable, and inequitable *as between the carriers parties thereto,* namely, between L & N or Coast Line on the one hand, and the several plaintiffs on the other. It is also clear from the quoted findings that the prescribed 29885 divisions are the primary divisions of the joint rates to be received by the L & N or Coast Line and by the northern carrier or carriers participating in the transportation of the same traffic to or from points in official territory.

■ The plaintiffs assert that in making its order the Commission failed to comply with the requirements of section 15(6) in that it did not give "due consideration" to the statutory elements which go to relative service costs. They further contend that relative costs furnish the *primary* criterion of fair divisions.

They argue that the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation and whether any particular participating carrier is an originating, intermediate, or delivering line, to all of which the statute requires "due consideration" to be given, are matters going to cost of service. The statute,[21] however, does not establish cost

---

while the estimated increases for the L & N and Coast Line would, together, have raised the rate of return for both railroads from 4.0733 per cent to 4.1300 per cent.

20. 49 U.S.C.A. § 15(6) provides in part as follows:

"Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates * * * applicable to the transportation of * * * prop-

erty, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto * * * the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers * * *."

21. 49 U.S.C.A. § 15(6) provides in part as follows:

"In so prescribing and determining the divisions of joint rates, fares, and charg-

of service or any other factor as the primary criterion of fair divisions. "Due consideration" is not the equivalent of "primary consideration." The importance to be given any of the factors enumerated in the statute must necessarily depend upon the case under consideration. The evaluation of the importance of the various factors in any given case is peculiarly the function of the Commission.

After making an analysis of the evidence of costs introduced by the parties, the Commission found that "the only comparable cost data for the complainants [L & N and Coast Line] and the defendants [the plaintiffs here] are on the basis of territorial or systemwide averages, which are not determinative of the costs of these particular movements." This finding is supported by substantial evidence.

An examination of the massive record of the proceedings before the Commission discloses that an abundance of evidence relating to costs was introduced at the hearings before the examiner. A study of the Commission's report shows clearly that the Commission gave careful consideration to this evidence.

A just share is the amount properly apportioned out of the joint rate. That amount is to be determined not by an agreement of the parties or by mileage, but is to be fixed at what the Commission finds to be just, reasonable, and equitable, and the cost of the service is one of the elements to be considered. See The New England Divisions Case, Akron, C. & Y. R. Co. v. United States, 1923, 261 U.S. 184, 195, 43 S.Ct. 270, 67 L.Ed. 605. "There is no single test by which 'just,' 'reasonable,' or 'equitable' divisions may be ascertained; no fact or group of facts may be used generally as a measure by which to determine what division will conform to these standards. Considerations that reasonably guide to decision in one case may rightly be deemed to have little or no bearing in other cases. Error as to the weight to be given financial needs, operating costs or other material facts is not a misconstruction of the act." Baltimore & O. R. Co. v. United States, 1936, 298 U.S. 349, 359, 56 S.Ct. 797, 803, 80 L. Ed. 1209.

The question of divisions involves the making of practical judgments and cannot be solved "as though it were a mathematical problem to which there could only be one correct answer." Interstate Commerce Commission v. Union Pacific R.R., 1912, 222 U.S. 541, 550, 32 S.Ct. 108, 112, 56 L.Ed. 308.

"Neither the Commission nor this Court has held that lesser cost of service is a finding without which the Commission may not fix a charge, division of rate, or differential." Alabama Great Southern Railroad Co. v. United States, 1951, 340 U.S. 216, 223, 71 S.Ct. 264, 270, 95 L.Ed. 225. In the footnote on page 223 of the case last cited, on page 270 of 71 S.Ct., the Court states: "Both the Commission and this Court have consistently rejected any thought that costs should be the controlling factor in rate making."

In the supplemental exceptions, dated March 9, 1959, filed by N.Y.C. to the proposed report of the examiner, it is stated (at page 24) that L & N's restatement of the northern railroads' cost study "destroyed any possible comparison by adjusting the L & N costs without making similar adjustments in the N.Y.C. costs." N.Y.C. went on to say that "it

es, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitled one carrier to a greater or less proportion than another carrier of the joint rate, fare, or charge."

would be unrealistic to expect the New York Central to study the movements at the 130 points involved" on its railroad. N.Y.C. argues that since the burden of proving the unreasonableness of existing divisions was upon the complainant L & N, it was incumbent upon the latter carrier to produce evidence of the relative costs of handling the traffic in question. L & N, however, did introduce in evidence its own actual costs in place of average costs. The costs put in evidence by N.Y.C. were unadjusted average costs for the northern railroads which did not reflect the actual costs. The Commission found that this evidence was not helpful in determining the costs of the particular traffic involved in this case. N.Y.C. now takes the position that the burden of adjusting the average costs presented in evidence by the *plaintiffs* was on the L & N, even though the data necessary to make these adjustments were not available to the L & N and could only be produced by the plaintiffs themselves. We think this position is untenable.

The plaintiffs allege in their amended complaint (Par. VII), and the defendants United States and Interstate Commerce Commission admit in their answer, that in prescribing divisions in No. 29885 the Commission had noted northern lines' evidence of relatively higher costs for the North than for the South in the years 1946 and 1948, but had not accepted this showing, because it considered it to be the safest assumption for the future that neither contesting group would have an appreciably lower basis of costs than the other; and that contrary to this assumption, the record in the instant proceedings contains uncontroverted cost comparisons both of the northern lines' and the Commission's Cost Section computation, which establish that the costs of the northern group have continued to increase relative to those of the southern group and now substantially exceed them. It is clear from the report, however, that in the Commission's judgment this fact was not of controlling significance in view of its finding that territorial or system-

wide averages are not determinative of the costs of the particular movements here involved.

■ It is contended by the plaintiffs that the Commission did not base its order upon the record before it but upon its earlier conclusions in No. 29885 without evidence to sustain its assumption of similar circumstances.

The Commission found that the record in No. 29885 "differed little in respect of border-point traffic from that before us here." This finding is supported by substantial evidence.

It was perfectly proper for the Commission to compare the records in the two dockets. All the parties before the Commission in this case were also parties before the Commission in Docket No. 29885. At the hearing before the examiner the plaintiffs themselves introduced in evidence (Exhibit 35) a documentary history of the divisions of border-point rates prescribed in Docket Nos. 24160 *and* 29885.

Evidence was received (Exhibit 3) of typical illustrations showing (1) present and proposed (29885) divisions and revenue on traffic between border points and official territory; (2) present (29885) divisions on traffic between border points and southern territory assuming same movements as in (1) and at same rate for similar hauls; and (3) present (29885) divisions and revenue on interterritorial traffic between official and southern territories, also assuming same movements as in (1) and at same rate for similar hauls.

Evidence was also received (Exhibit 4) of present and proposed divisions and revenue on traffic between border points and official territory on the one hand, and present divisions and revenue on traffic to or from southern points intermediate to and (or) beyond the border point assuming same car as above moved at same rate for similar hauls.

The Commission's finding that border-point traffic to the North moves under similar circumstances as border-point traffic to the South is supported by sub-

stantial evidence. Joint rates on the latter traffic are being divided on the validly established 29885 basis of divisions.

▉ A validly established and currently applied basis of divisions of revenue derived from similar traffic moving in the same or adjacent territory under similar circumstances may. properly be considered as a criterion, though not necessarily a controlling one, of the reasonableness of prescribing the same basis of divisions of the revenue here in issue. See Youngstown Sheet & Tube Co. v. United States, 1934, 295 U.S. 476, 480, 55 S.Ct. 822, 79 L.Ed. 1553; see also United States v. Northern Pacific Ry. Co., 1933, 288 U.S. 490, 500, 53 S.Ct. 406, 77 L.Ed. 914.

▉ The plaintiffs point out that Docket No. 29885 has been reopened by the Commission and that the basis of divisions established in that case is being re-examined. They argue that this fact together with the evidence of higher current costs of operation for northern railroads introduced in the case now under review renders unreasonable the application of that basis to this case. The validity of that argument is necessarily based on the assumption that in the reopened case the Commission will not only find higher group costs in the north but will also give controlling weight to that finding. The plaintiffs are in effect asking that we annul the order on the assumption that the Commission will decide the reopened proceedings in favor of the plaintiffs, that the decision will be made retroactive, and that if challenged in the courts it would be ultimately upheld. We cannot reasonably make these assumptions. We cannot predict what the final decision in the reopened case will be.

A suspension of the operation of the order until the reopened proceedings have been concluded is open to the added objection that it would be tantamount to a reversal by this Court of the Commission's refusal to consolidate this proceeding with the reopened Docket No. 29885. That action was clearly within the scope of the Commission's discretionary power.

▉ The New York Central claims that in prescribing the 29885 basis of divisions for the instant traffic the Commission ignored the typical evidence rule. In The New England Divisions case, Akron, C. & Y. R. Co. v. United States, 1923, 261 U.S. 184, page 199, 43 S.Ct. 270, page 276, 67 L.Ed. 605, the Court stated:

"Congress may, consistently with the due process clause, create rebuttable presumptions * * * and shift the burden of proof * * *. It might, therefore, have declared in terms that, if the Commission finds that evidence introduced is typical of traffic and operating conditions, and of the joint rates and divisions, of the carriers of a group, it may may be accepted as *prima facie* evidence bearing upon the proper divisions of each joint rate of every carrier in that group. Congress did so provide, in effect, when it imposed upon the Commission the duty of determining divisions. For only in that way could the task be performed."

The Court restated the rule in Beaumont, S. L. & W. Ry. v. United States, 1930, 282 U.S. 74, at pages 82–83, 51 S.Ct. 1, at page 4, 75 L.Ed. 221:

"The Commission may not change an existing division unless it finds that division unjust or unreasonable. * * * But it need not under all circumstances take specific evidence as to each rate of every carrier. When considering divisions of numerous joint rates applicable to traffic passing through gateways between different territories, the Commission may make the required determinations and establish the bases for divisions between groups of carriers in the respective territories upon evidence which it reasonably · may deem typical and to have sufficient probative weight to justify the necessary findings and the order in respect of each rate. That is to say, such typical evidence may sufficiently disclose the facts necessary to enable the Commission duly to consider

the divisions of each joint rate to be received by every carrier."

There was evidence, typical in character and sufficient in quantity, of the nature of the traffic and operating conditions, and of the joint rates and bases of divisions, of L & N and Coast Line on the one hand, and of the participating northern railroads as a group on the other, to enable the Commission to prescribe the 29885 basis of divisions without the necessity of requiring specific evidence and separate adjudication in respect to each division of the joint rates between each of the two southern railroads and each plaintiff.

■ The plaintiffs contend that the Coast Line stations involved in this case are not border points. This contention was considered and rejected by the Com-

mission.[22] The Commission's finding that they are border points is supported by substantial evidence (see Exhibits 19 and 25, and Transcript, pp. 128–129).[23]

■ The New York Central states that the Commission erred in concluding (page 503 of its report) that the "fact that only two carriers of the few serving the border points are complainants is not a controlling factor." In the absence of any showing of the nature and extent of the interest of the southern carriers not parties to the proceeding, it cannot reasonably be held that the Commission's conclusion is erroneous. The failure of such other carriers for undisclosed reasons to join in these proceedings did not preclude L & N and Coast Line from asserting their claim for relief. The joinder of the other southern carriers was

22. "Stations on the line of the Norfolk & Western extending from the territorial boundary southward to Bristol, Va., are recognized as in official territory, and traffic between them and other points in the South are accorded the 29885 interterritorial divisions. The same is true with respect to Chesapeake & Ohio stations in southern territory. Geographically and for ratemaking purposes, the latter stations occupy the same position in southern territory as the considered Coast Line stations do in official territory. Those two carriers participate in the 29885 basis from stations geographically located with respect to border territory and the gateways generally the same as those on the Coast Line." (Page 503 of the Commission's report.)

"The Coast Line stations occupy a geographic position in official territory similar to that of the Norfolk & Western stations south of the border in Virginia and North Carolina, and also similar to certain of the Chesapeake & Ohio stations in southern territory, now enjoying the 29885 divisions." (Page 510 of the Commission's report.)

Both the Norfolk & Western and Chesapeake & Ohio are plaintiffs here.

23. Exhibit 25 shows generally the stations on the Norfolk & Western and the Chesapeake & Ohio south of the line which were considered by the Commission in Class Rate Investigation, 1939, 262 I.C.C. 447, as being part of official territory even though geographically they are in the South. The reason for the inclusion of these points south of the

border was explained on page 527 of the cited Class Rate Investigation case as follows:

"Although certain points on the Chesapeake & Ohio Railway in Kentucky, and on the Norfolk & Western Railway in Virginia, are within the boundaries of southern territory, rates between them and official territory are discussed under this title of the report dealing with rates within the latter, because in the eastern revision they were treated with rates in official territory, and they are subject to official classification."

Those points are therefore in official classification territory on traffic moving to or from the North but they are also in southern classification territory on traffic moving to or from the South. They are border points, and on the latter traffic the divisions are based on Docket 29885. The Coast Line stations involved in this proceeding are likewise in official classification territory on traffic to and from the North and in the southern classification territory on traffic to and from the South. They also lie in the area between North and South. The rates of Coast Line on traffic between these border points and the North are all intraterritorial in nature, as are the rates of Norfolk & Western and Chesapeake & Ohio on traffic between their border points referred to above and the South. The Commission properly found that there is no practical difference between the movement of the traffic to or from the North and the movement of the traffic to or from the South.

not essential. The order entered by the Commission is directed to L & N, Coast Line, and the northern carriers. It does not purport to affect the division of rates between any other southern carrier and the northern railroads. United States v. Abilene & So. Ry. Co., 1924, 265 U.S. 274, 283, 44 S.Ct. 565, 68 L.Ed. 1016.

We are persuaded from a careful study of the record that the findings of fact made by the Commission are supported by substantial evidence and that they in turn supply a rational basis for the ultimate findings and for the order. We are further of the opinion that in arriving at its decision the Commission substantially observed the standards prescribed by the Interstate Commerce Act.

The plaintiffs' amended complaint and the complaint of the New York Central, intervening plaintiff, are therefore dismissed.