CHICAGO & NORTH WESTERN RAILWAY CO.
ET AL. *v.* ATCHISON, TOPEKA & SANTA FE
RAILWAY CO. ET AL.

No. 8. Argued April 19, 1967.—Decided May 29, 1967.*

*Together with No. 23, *United States et al.* v. *Atchison, Topeka &
Santa Fe Railway Co. et al.,* also on appeal from the same court.

328

*Hugh B. Cox* argued the cause for appellants in No. 8. With him on the briefs were *William H. Allen, Nuel D. Belnap, Richard M. Freeman, Bryce L. Hamilton, Raymond K. Merrill* and *Nye F. Morehouse.*

*Arthur J. Cerra* argued the cause for the United States et al. in No. 23. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Robert B. Hummel, Jerry Z. Pruzansky* and *Robert W. Ginnane.*

*Howard J. Trienens* argued the cause for appellees Atchison, Topeka & Santa Fe Railway Co. et al. With him on the brief were *Douglas F. Smith, George L. Saunders, Jr.,* and *Gary L. Cowan. George L. Saunders, Jr.,* argued the cause for appellees Missouri-Kansas-Texas Railroad Co. et al. With him on the brief was *John E. McCullough. Calvin L. Rampton* argued the cause for appellees Arizona Corporation Commission et al. With him on the brief were *Robert Y. Thornton* and *Richard W. Sabin. Cyril M. Saroyan* argued the cause for appellees the State of California et al. With him on the brief were *Mary Moran Pajalich* and *J. Thomason Phelps.*

*Walter R. McDonald* filed a brief for the Southern Governors' Conference et al., as *amici curiae,* in No. 23.

MR. JUSTICE STEWART delivered the opinion the Court.

This is a controversy between the Mountain-Pacific railroads and certain Midwestern railroads, involving the proper division between them of joint rates from through freight service in which they both participate. Dissatisfied with their share of existing divisions, the Midwestern carriers called upon the Interstate Commerce Commission's statutory authority to determine that joint rate divisions "are or will be unjust, unreasonable, inequitable, or unduly preferential," and to prescribe "just, reasonable,

and equitable divisions" in their place.[1]  The Commission found that the existing divisions were unlawful, and established new divisions which, on the average, gave the Midwestern carriers a greater share of the joint rates.[2] The District Court set aside the Commission's order on the ground that certain of its findings were deficient.[3] We noted probable jurisdiction, 383 U. S. 964, to consider important questions regarding the Commission's powers and procedures raised by the District Court's decision.

## I.

There were originally three groups of railroads involved in the proceedings before the Commission: the Eastern, Midwestern, and Mountain-Pacific carriers.  The Eastern railroads operate in the northeastern area of the United States extending south to the Ohio River and parts of Virginia and west to central Illinois.  Midwestern Territory lies between Eastern Territory and the Rocky Mountains, and the rest of the United States to the west constitutes Mountain-Pacific Territory.  The latter is subdivided into Transcontinental Territory—comprising the States bordering the Pacific, Nevada, Arizona, and parts of Idaho, Utah, and New Mexico—and Intermountain Territory.  The railroads operating in Southern Territory, which includes the southeastern United.

---

[1] Interstate Commerce Act, § 15 (6), 41 Stat. 486, 49 U. S. C. § 15 (6).  See also § 1 (4) of the Act, 54 Stat. 900, 49 U. S. C. § 1 (4), which provides, in pertinent part, that: "It shall be the duty of every . . . common carrier establishing through routes . . . in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers."

[2] 321 I. C. C. 17, 322 I. C. C. 491.

[3] 238 F. Supp. 528.

States, were not involved in the proceedings before the Commission.[4]

Railroads customarily establish joint through rates for interterritorial freight service, and the divisions of these rates, fixed by the Commission or by agreement, determine what share of the joint tariffs each of the several participating carriers receives. See *St. Louis S. W. R. Co.* v. *United States,* 245 U. S. 136, 139–140, n. 2. In 1954 the Eastern carriers filed a complaint with the Commission seeking a greater share of the joint tariff on freight traffic east and west between Eastern Territory and Transcontinental Territory. Shortly thereafter, the Midwestern carriers also filed a complaint, requesting higher divisions on (1) their intermediate service on Eastern-Transcontinental traffic, (2) their service on freight traffic east and west between Midwestern Territory and Transcontinental Territory. Some of the Midwestern lines had long believed that the Mountain-Pacific carriers enjoyed an unduly high share of the joint tariffs for these categories of traffic. When joint rates for traffic to the western United States were first established in the 1870's, rates were divided on the basis of the miles of carriage rendered by the participating railroads, but the Mountain-Pacific carriers enjoyed a 50% inflation in their mileage factor.[5] In 1925, after

---

[4] Certain Southern carriers did participate in some of the proceedings before the Commission in relation to service they perform in Eastern Territory. And the Southern Governors' Conference and the Southeastern Association of Railroad and Utilities Commissioners, parties in pending litigation involving divisions between Southern and Eastern Territory, filed an *amicus* brief here.

[5] Assume a carriage of 1,000 miles by a Mountain-Pacific road and 500 miles by Midwestern carrier. On a straight mileage basis of dividing the joint rate fare, the Mountain-Pacific carrier would receive two-thirds of the fare and the Midwestern road one-third.

the Commission had begun, but not yet completed, an investigation of the existing divisions, the Mountain-Pacific carriers agreed to modest increases in the Midwestern railroads' share of joint rates. The divisions between Mountain-Pacific and Midwestern carriers have remained unchanged since that time.[6]

In the proceedings before the Commission, which consolidated the Eastern and the Midwestern complaints, the Mountain-Pacific railroads not only defended the existing divisions, but sought a 10% increase in their share. Regulatory commissions of States in Mountain-Pacific Territory also intervened. The consolidated proceedings involved rate divisions affecting about 300 railroads, which voluntarily aligned themselves into three groups— Eastern, Midwestern, and Mountain-Pacific—and submitted evidence and tried the case on this group basis. A great deal of time was consumed in compiling and introducing massive amounts of evidence—more than 800 exhibits and over 11,200 pages of testimony. The Hearing Examiners made a recommended report in 1960. After considering written briefs and oral arguments from the various groups of parties, the Commission issued its original report in March of 1963. The Commission found the existing divisions to be unlawful, and prescribed

Under the system described in the text, the Mountain-Pacific carrier would be credited with 1,500 miles of carriage and the Midwestern line 500. They would accordingly divide the joint fare on a three-fourths–one-fourth basis.

[6] In 1929, the Commission undertook another investigation of the Midwestern-Transcontinental divisions. In 1934, on the basis of a record it termed "most unsatisfactory," the Commission concluded that "we are unable to find that the divisions of the transcontinental rates are unlawful." *Divisions of Freight Rates,* 203 I. C. C. 299, 335. In the present proceeding, the Commission stated that the weight to be ascribed its 1934 decision was a question "of little moment . . . in view of changes which have occurred in the intervening years." 321 I. C. C. 17, 72.

increased divisions for the Midwestern and Eastern carriers, effective July 1, 1963.

When exercising its statutory authority to establish "just and reasonable" divisions under § 15 (6) of the Interstate Commerce Act, the Commission is required to:

> "[G]ive due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare or charge." [7]

After reviewing the nature of the traffic involved and considering the special claims of the various groups, the Commission found that "none of the contending groups is more or less efficiently operated than another," and that "there are no differences in the importance to the public attributable to the three contending groups of carriers." Its decision thus turned on more direct financial considerations, to which the Commission devoted a substantial part of its lengthy report. Under Commission practice, these financial considerations are divided into "cost of service" and "revenue needs." The former consists of the out-of-pocket expenses directly associated with a particular service, including operating costs, taxes, and a four percent return on the property involved.

---

[7] Interstate Commerce Act, § 15 (6), 41 Stat. 486, 49 U. S. C. § 15 (6).

"Revenue needs" refers to broader requirements for funds in excess of out-of-pocket expenses, including funds for new investment.

In determining cost of service, the Commission relied upon a cost study prepared by the Mountain-Pacific railroads, but introduced certain modifications that produced different results. The Commission found that existing divisions on Eastern-Transcontinental traffic gave the Mountain-Pacific carriers revenues that exceeded their costs by 57%, while the Midwestern and Eastern railroads received only 43% and 22% more, respectively, than their costs for the service they contributed. On Midwestern-Transcontinental traffic, the Commission found that the divisions gave the Mountain-Pacific carriers revenues 71% above cost, while the Midwestern lines received only 39% above cost; on this traffic the Midwestern railroads bore 31.5% of the total cost but received only 27.1% of the total revenue.

In assessing comparative revenue needs, the Commission found, that the average rate of return for 1946–1958, based on net railway operating income from all services as a percentage of the value of invested property,[8] was 3.40% for the Eastern roads, 3.49% for the Midwestern group, and 4.64% for the Mountain-Pacific carriers. The Commission also found that the Mountain-Pacific railroads had the most favorable record and trend in both freight volume and freight revenues, and the Eastern railroads the least favorable, with the Midwestern roads occupying an intermediate position. In response to the Mountain-Pacific carriers' complaint that their net operating income from all services had not increased as fast as net investment in recent years, the Commission

---

[8] The value of the investment base was determined for this purpose by the valuations of railroad property made by the Commission's Bureau of Valuation.

noted that this was primarily due to disproportionate passenger deficits that offset favorable income from freight services. The Commission also discounted the contention that the Mountain-Pacific carriers were entitled to greater revenues to provide funds for new investment, finding that the needs of the various carrier groups for such funds were not appreciably different. The claim of the Midwestern carriers that they had the most pressing need for revenues was also rejected by the Commission.

From all this evidence, the Commission concluded "that there should be increases in [the Eastern carriers'] divisions reflecting revenue need as well as cost." While the very poor financial position and high revenue needs of the Eastern carriers were thus important elements in prescribing increases in their divisions, the Commission went on to find cost considerations the controlling factor with regard to the Midwestern divisions: "As between the [Mountain-Pacific railroads] and the [Midwestern] railroads the differences in earning power are less marked, but our consideration of the evidence bearing on cost of service previously discussed convinces us that the primary midwestern divisions as a whole are too low."

In establishing higher divisions for the Eastern carriers, the Commission relied upon the existing percentages governing divisions of the various rates between well-defined subareas in Eastern Territory and points in Transcontinental Territory. The Commission simply increased the percentages that the Eastern carriers formerly received on this traffic.[9] However, the Commission concluded that it could not follow this procedure

[9] Thus, for carriage between the Buffalo-Pittsburgh area to points on or near the Pacific coast, with interchange at Chicago, the Commission provided that the Eastern carrier should receive 22% of the joint fare, leaving the remaining 78% to be divided between carriers providing service west of Chicago.

with respect to Midwestern divisions on Eastern-Transcontinental and Midwestern-Transcontinental traffic. It found that Midwestern-Transcontinental subgroupings were not well-defined and were in some cases not properly related to distance. Thus it was not feasible to assemble rates from various Midwestern points to Transcontinental points into common groups and apply fixed percentage divisions to each group in order to determine the respective shares of the Midwestern and Mountain-Pacific carriers. Instead, the Commission resorted to a weighted mileage basis of apportionment, determined through the use of divisional scales. The Commission has frequently used such scales in the past, and their use in this case was suggested by both the Midwestern and Mountain-Pacific carriers. Under the system adopted, the mileage contributed by each carrier to the joint service is broken down into 50-mile blocks. The scale chosen assigns each block a number. A large number is assigned the first block, and a smaller number to successive 50-mile increments; this is designed to reflect terminal and standby costs incurred regardless of the length of carriage contributed. Each carrier then receives a share of the joint revenue in proportion to the sum of scale numbers corresponding to its mileage contribution. To determine the divisions between the Midwestern and Mountain-Pacific carriers, the Commission used a 29886 scale—so named because it was developed in another interterritorial divisions case bearing that docket number.[10] This scale assigns a factor of 65 to the first 50-mile block of carriage and a factor of 12 to each successive 50-mile increment.[11] The Commission decided that the Midwestern carriers' shares would be determined by an unadjusted 29886 scale, but that the Mountain-Pacific

---

[10] *Official-Southwestern Divisions,* 287 I. C. C. 553.

[11] A few of the 50-mile increments enjoy a factor of 13. See table, n. 13, *infra.*

carriers' shares should be based on the same scale with the mileage factors inflated by 10% to reflect certain greater costs of carriage in the mountainous West. Thus, for their carriage, the Mountain-Pacific carriers would enjoy a factor of 72 for the first 50-mile block, and a factor of 13 for successive 50-mile increments.[12] For any joint carriage, the Midwestern and Mountain-Pacific carriers would translate their mileage contributions into scale numbers, and divide the proceeds in proportion to the numbers so obtained.[13] The divisions thus essentially

---

[12] Some of the 50-mile increments enjoy factors of 14 or 15. See table, n. 13, *infra.*

[13] The scale prescribed by the Commission is as follows:

SCALES OF DIVISIONAL FACTORS.

| Miles | One | Two | Three | Miles | One | Two | Three |
|---|---|---|---|---|---|---|---|
| 50 | 65 | | 72 | 1,100 | 318 | 292 | 350 |
| 100 | 77 | | 85 | 1,150 | 330 | 304 | 363 |
| 150 | 89 | | 98 | 1,200 | 342 | 316 | 376 |
| 200 | 101 | 75 | 111 | 1,250 | 354 | 328 | 389 |
| 250 | 113 | 87 | 124 | 1,300 | 367 | 341 | 404 |
| 300 | 125 | 99 | 138 | 1,350 | 379 | 353 | 417 |
| 350 | 137 | 111 | 151 | 1,400 | 391 | 365 | 430 |
| 400 | 149 | 123 | 164 | 1,450 | 403 | | 443 |
| 450 | 161 | 135 | 177 | 1,500 | 415 | | 457 |
| 500 | 174 | 148 | 191 | 1,550 | 427 | | 470 |
| 550 | 186 | 160 | 205 | 1,600 | 439 | | 483 |
| 600 | 198 | 172 | 218 | 1,650 | 451 | | 496 |
| 650 | 210 | 184 | 231 | 1,700 | 463 | | 509 |
| 700 | 222 | 196 | 244 | 1,750 | 475 | | 523 |
| 750 | 234 | 208 | 257 | 1,800 | 487 | | 536 |
| 800 | 246 | 220 | 271 | 1,850 | 499 | | 549 |
| 850 | 258 | 232 | 284 | 1,900 | 511 | | 562 |
| 900 | 270 | 244 | 297 | 1,950 | 523 | | 575 |
| 950 | 282 | 256 | 310 | 2,000 | 535 | | 589 |
| 1,000 | 294 | 268 | 323 | 2,050 | 547 | | 602 |
| 1,050 | 306 | 280 | 337 | 2,100 | 559 | | 615 |

DEFINITIONS.

Column Three provides the factor for the Mountain-Pacific haul. Column One provides the Midwestern factor on Midwestern-

reflect a mileage basis, with disproportionate weight assigned the first 50 miles of carriage and an overall inflation factor favoring the Mountain-Pacific carriers. The Commission found that the net effect of its revised scale would be to "produce moderate increases in some of the most important midwestern divisions."

After entertaining petitions for reconsideration, the Commission adopted a supplemental report in late 1963. For the first time, a few carriers abandoned the three-group basis on which all the prior proceedings had been conducted. Requests for special treatment were made on behalf of one Mountain-Pacific road, the Denver & Rio Grande, and two Midwestern carriers, the Missouri-Kansas-Texas (Katy) and the St. Louis-San Francisco (Frisco), on the ground that the divisions prescribed by the Commission had an unduly harsh effect on them.[14] The Commission considered and largely rejected these and other criticisms of its original decision, and issued a supplemental order substantially reaffirming its original order after making minor technical modifications.

Eleven of the Mountain-Pacific carriers brought an action in the District Court to enjoin and set aside

---

Transcontinental traffic, and Column Two the Midwestern factor for Eastern-Transcontinental traffic. Column Two also applies to subdivisions of carriage in Midwestern Territory.

To illustrate the operation of the scale, assume a carriage of 1,000 miles in Midwestern Territory by a Midwestern railroad and an additional carriage by a Mountain-Pacific road of another 1,000 miles in Mountain-Pacific Territory. Column One gives the Midwestern carrier a factor of 294, and Column Three assigns the Mountain-Pacific railroad a factor of 323. The sum of the factors is 617. The Midwestern carrier would receive 294/617, or 48% of the joint rate, and the Mountain-Pacific carrier 323/617, or 52% of the rate.

[14] Certain individual contentions were also made by the Wabash Railroad on petition for reconsideration before the Commission, but they are no longer part of the issues in these cases (hereafter referred to as this case).

the Commission's orders and succeeded in obtaining preliminary injunctions. Other Mountain-Pacific carriers, the western state regulatory commissions, and the Katy and the Frisco intervened as plaintiffs, while the Eastern carriers and a group of Midwestern railroads intervened on the side of the Government and the Commission as defendants. In January 1965 the District Court handed down the decision setting aside the Commission's orders. The court held that the findings made by the Commission with regard to the revenue need, cost of service, public importance, etc., of the Eastern, Midwestern, and Mountain-Pacific carriers were insufficient because they were made on a group basis. In the view of the District Court, the Interstate Commerce Act required the Commission to make such findings with respect to each of the 300 railroads involved, on an individual basis. The District Court further held that in a divisions case the Commission is obliged to determine, in precise dollar amount, the revenue needs of each individual railroad, and also the revenue effect on each individual railroad, again in precise dollar amount, of the new divisions that the Commission establishes. The District Court in conclusion stated:[15]

> "[T]hat to comply with . . . the Interstate Commerce and the Administrative Procedure Acts . . . the Commission is required to make affirmative findings which disclose that the requirements of Section 15 (6) have been met and the factors therein required have been determined and considered, not only as to the groups of roads involved but with respect to each carrier affected in said groups; that findings must be made as to the amount of revenue, in terms of dollars, required by the respective carriers affected in any new divisions prescribed, the financial effect of the Commission's orders in terms of dollars as to

---

[15] 238 F. Supp., at 539.

the carriers and the extent to which the new divisions prescribed will produce the revenue found to be required . . . ."

The Eastern carriers, the Midwestern defendants, and the Government and the Commission all appealed the decision of the District Court. Thereafter, all of the Eastern and some of the Midwestern carriers [16] reached settlement agreements with the Mountain-Pacific carriers covering the rate divisions affecting them. We accordingly vacated the judgment of the District Court with respect to the divisions of the Eastern and the settling Midwestern railroads, and remanded the relevant portions of the appeals to the District Court with instructions to dismiss as moot. 383 U. S. 832, 384 U. S. 888. Thus, the principal dispute remaining concerns the divisions between the Mountain-Pacific carriers and the eight principal Midwestern roads that are appellants in No. 8.[17]

## II.

None of the appellees now defends the position, espoused by the District Court, that the Commission was required to make separate individual findings for each of the 300 railroads involved in the proceedings before it.

---

[16] The nonsettling Midwestern railroads include the eight appellants in No. 8, the Chicago & North Western, the Chicago Great Western, the Chicago, Milwaukee, St. Paul & Pacific, the Green Bay and Western, the Gulf, Mobile & Ohio, the Illinois Central, the Missouri Pacific, and the Soo Line, and 45 of their short-line connections.

[17] Also involved are subdivisions in Midwestern Territory between the Midwestern appellants and the settling Midwestern roads. Furthermore, five of the Midwestern appellants operate in a small part of Eastern Territory, comprising southeastern Illinois and a few areas in Indiana. The Eastern divisions are applicable to some of these operations, but the only active issue between the appellants and the Mountain-Pacific roads relating to these divisions is a 15% minimum division prescribed by the Commission and discussed in Part V of this opinion.

But the error in that position, which rejects over 40 years of consistent administrative practice, requires comment.

In its first decision involving rate divisions under § 15 (6), the *New England Divisions Case,* 261 U. S. 184, the Court upheld the authority of the Commission to take evidence and make findings on a group basis. Speaking for a unanimous Court, Mr. Justice Brandeis noted that the "actual necessities of procedure and administration" required procedures on a group basis in ratemaking cases, and that a similar practice was appropriate in divisions cases. The complexity of the subject matter and the multiplicity of carriers typically involved in divisions cases were such that a wooden requirement of individual findings would make effective regulation all but impossible. The Court held that the Interstate Commerce Act permits the Commission to proceed on a group basis and to rely on "evidence which the Commission assumed was typical in character, and ample in quantity" to justify its findings, reasoning that:

> "Obviously, Congress intended that a method should be pursued by which the task, which it imposed upon the Commission, could be performed. . . . To require specific evidence, and separate adjudication, in respect to each division of each rate of each carrier, would be tantamount to denying the possibility of granting relief. We must assume that Congress knew this . . . ." 261 U. S., at 196–197.

Both the Court [18] and the Commission [19] have consistently adhered to this construction of the Act's require-

---

[18] *Beaumont, S. L. & W. R. Co.* v. *United States,* 282 U. S. 74; *B. & O. R. Co.* v. *United States,* 298 U. S. 349; *Boston & Maine R. Co.* v. *United States,* 371 U. S. 26, affirming 208 F. Supp. 661.

[19] *E. g., Southwestern-Official Divisions,* 234 I. C. C. 135; *Divisions of Rates, Official and Southern Territories,* 234 I. C. C. 175; *Official Western Trunk Line Divisions,* 269 I. C. C. 765; *Official-*

ments, and its rejection by the District Court in this case was error.[20]

The pragmatic justifications for the Commission's group procedures are obvious. Even on a group basis, the Commission proceedings in this case required a voluminous record and were not completed until nearly 10 years after the complaints were filed. To demand individual evidence and findings for each of the 300 carriers in the Commission proceedings would so inflate the record and prolong administrative adjudication that the Commission's regulatory authority would be paralyzed.

Nor do considerations of fairness require disregard of administrative necessities. The premise of group proceedings, as the *New England Divisions Case* explicitly recognized, is that evidence pertaining to a group is typical of its individual members. 261 U. S., at 196–199. See also *Beaumont, S. L. & W. R. Co.* v. *United States,* 282 U. S. 74, 82–83. It has always been accepted that an individual carrier may challenge this premise and, on proper showing, receive independent consideration if its individual situation is so atypical that its inclusion in group consideration would be inappropriate. It is the Commission's practice to accord independent treatment to an individual carrier when a proper request for special consideration is made.[21] But no such requests were made

---

*Southern Divisions,* 287 I. C. C. 497; *Official-Southwestern Divisions,* 287 I. C. C. 553, 289 I. C. C. 11; *Official-Southern Divisions,* 325 I. C. C. 1.

[20] We cannot accept the notion that the Administrative Procedure Act, 60 Stat. 237, as amended, 5 U. S. C. §§ 551–559 (1964 ed. Supp. II), overruled these established precedents and imposed a requirement of individual findings upon the Commission.

[21] For example, in *Official-Southern Divisions,* 325 I. C. C. 1, 449, the Commission undertook separate consideration and prescribed special divisions for the Norfolk Southern Railroad after that carrier had disassociated itself from its geographical group and presented evidence on an individual basis.

during the hearings and presentation of evidence in this case. Instead, the individual carriers voluntarily aligned themselves into groups, presented evidence and tried the case on a group basis, and asked the Commission to prescribe new divisions on a group basis. In this situation, the Commission was not obliged on its own motion to demand evidence and make findings on an individual basis. Departure from the practicalities of group procedure is justified only when there is a real need for separate treatment of a given carrier; the individual carriers themselves, which have the closest understanding of their own situation and interests, are normally the appropriate parties to show that such need exists.

The Denver & Rio Grande, the Katy, and the Frisco did request independent consideration in petitions for reconsideration of the Commission's original decision. Their claims will be discussed below in Part VI of this opinion, but it should be noted that at no point during the administrative hearings or the presentation of evidence did they raise any claim for separate treatment. Moreover, their contention basically is not that the group evidence or findings were unrepresentative, but rather that the divisions prescribed by the Commission have an unduly harsh impact on them. Even if it were assumed that the Commission's disposition of this contention was erroneous, that would be no ground for requiring the Commission to make individual findings for the rest of the 300 carriers involved.

## III.

Among the errors that the District Court found in the Commission's decision was its failure to state the revenue needs of each individual carrier in terms of precise dollar amount. While not defending the requirement of individual findings, the appellees do contend that the Commission was required to determine the revenue needs of

the various carrier groups in precise dollar amount, and they also urge other errors in the Commission's treatment of revenue needs. We believe, however, that in the case's present posture these criticisms are largely misdirected.

In increasing the shares of the Eastern railroads the Commission did rely on revenue needs as well as costs, but it found costs alone the controlling factor in raising the divisions of the Midwestern carriers. In the conclusions in its original report, the Commission stated that there should be increases in the Eastern divisions "reflecting revenue need as well as cost," but in the very next sentence it went on to say that as between the Midwestern and Mountain-Pacific roads, "differences in earning power are less marked, but our consideration of the evidence bearing on cost of service previously discussed convinces us that the primary midwestern divisions as a whole are too low." Its reliance on costs alone in increasing the Midwestern shares is confirmed by the Commission's supplemental report, in which it again rejected a request of the Midwestern carriers for even higher divisions based on their claim of pressing revenue needs: "It was our stated view that [increases in the Midwestern divisions] were supported by the evidence concerning cost of service, but that the proposal of the midwestern lines gave undue weight to their claimed revenue need." [22] Since revenue needs were important factors only with regard to the Eastern divisions, and those divisions are no longer in issue because the Eastern roads have settled with the Mountain-Pacific carriers, any errors committed by the Commission in its treat-

---

[22] That the Commission based its increase of the Midwestern divisions on costs is further indicated by its rejection, in its original report, of divisional scales proposed by the Mountain-Pacific carriers on the ground that they were based on studies which "understate the costs of the midwestern lines."

ment of revenue needs are no longer relevant.[23] But even assuming that the Commission did attach some limited significance to revenue needs in raising the Midwestern divisions, we cannot conclude that its treatment of revenue needs was legally inadequate. The Commission devoted over 25 pages of its reports to revenue needs. It discussed at length the proper basis for computing rates of return and found the rates of return for the various carrier groups; it also examined the record and trends in net railway operating income from all services, and from freight and passenger services considered separately.

The Commission placed considerable emphasis on rates of return in its discussion of comparative revenue needs. Following its established practice, it found that a value basis, rather than book cost, as urged by the Mountain-Pacific roads, was the proper method for calculating the investment base.[24] The evidence disclosed that the Mountain-Pacific lines had enjoyed a 4.64% return, as opposed to 3.40% for the Eastern lines, and 3.49% for the Midwestern lines. The suggestion that these findings in terms of rate of return were insufficient because they did not express revenue needs in terms of absolute dollar amount is totally novel and unreasonable. This suggestion seems to stem from a misconception of the Commission's function in divisions cases. Its task is not to transfer lump sums of cash from one carrier to another, but to "make divisions that colloquially may be said to be fair." *B. & O. R. Co.* v. *United States,* 298

---

[23] The Eastern divisions do apply to some service by five of the Midwestern appellants in a small part of Eastern Territory, but the only active issue with regard to these divisions is whether the Commission's minimum 15% divisions are justified by the evidence on cost. See n. 17, *supra.*

[24] See n. 8, *supra.*

U. S. 349, 357.[25] The relative financial strength of the carriers involved is a key factor in this task, see the *New England Divisions Case*, 261 U. S. 184, 189–192, and the use of comparative rates of return is an obviously appropriate basis for the exercise of administrative judgment. Rates of return are a familiar tool of analysis in the financial community. The Commission has long relied on this form of analysis in divisions cases,[26] and in passing on the Commission's performance in such cases, this Court has never suggested that ultimate findings of revenue need in terms of absolute dollar amount were required.[27] Appellees are unable to suggest any clear

[25] As the Court observed in *ICC* v. *Hoboken R. Co.*, 320 U. S. 368, 381, "The prescription of divisions where carriers are unable to agree is not a mere partition of property. It is one aspect of the general rate policy which Congress has directed the Commission to establish and administer in the public interest." See also the *New England Divisions Case*, 261 U. S. 184, 195.

[26] *E. g., New England Divisions*, 66 I. C. C. 196, 202; *Alabama & Mississippi R. Co.* v. *A., T. & S. F. R. Co.*, 95 I. C. C. 385, 402–403; *Divisions of Freight Rates*, 148 I. C. C. 457, 476; *Atlantic Coast Line R. Co.* v. *Arcade & A. R. Co.*, 194 I. C. C. 729, 752–755, 198 I. C. C. 375, 382–384; *Divisions of Freight Rates*, 203 I. C. C. 299, 328, 342; *Southwestern-Official Divisions*, 216 I. C. C. 687, 701–702, 739; *Southwestern-Official Divisions*, 234 I. C. C. 135, 146, 148; *Official-Southern Divisions*, 287 I. C. C. 497, 503–504; *Official-Southwestern Divisions*, 287 I. C. C. 553, 564, 289 I. C. C. 11, 12.

[27] *Beaumont, S. L. & W. R. Co.* v. *United States*, 282 U. S. 74; *B. & O. R. Co.* v. *United States*, 298 U. S. 349; *Boston & Maine R. Co.* v. *United States*, 371 U. S. 26, affirming 208 F. Supp. 661. Cf. *New York* v. *United States*, 331 U. S. 284, 329, 347–349.

*Chicago, M., St. P. & P. R. Co.* v. *Illinois*, 355 U. S. 300, relied upon by the appellees, is not apposite. There the Court upheld the District Court in setting aside an order of the Commission made under § 13 (4) of the Interstate Commerce Act, 24 Stat. 383, as amended, 49 U. S. C. § 13 (4). The Commission had ordered increases in fares on an intrastate passenger run made by the Milwaukee Road, on the ground that existing fares did not cover

regulatory purpose that would be served by such findings. We decline now to impose upon the Commission a rigid mechanical requirement that is without foundation in precedent, practice, or policy.

Appellees, especially the regulatory commissions, vigorously contend that reliance on rates of return showing the Mountain-Pacific carriers in a heavily favorable position was inappropriate because the Commission overlooked the Mountain-Pacific carriers' disproportionate need for funds for new investment. It might be questioned whether forcing carriers in other parts of the country to accept divisions lower than those to which they would otherwise be entitled is a sensible means of raising funds for new investment in the Far West. But the Commission did not reach this issue because it found that the Mountain-Pacific carriers did not in fact have

operating and indirect costs and thus constituted an "undue, unreasonable, or unjust discrimination" against the Milwaukee Road's interstate operations. The Court held that the Commission erred in comparing the costs and revenues of the particular intrastate service involved instead of all the Milwaukee Road's intrastate operations in Illinois taken together. In a footnote, the Court also stated that it agreed with the District Court's holding that the Commission had not satisfactorily explained how it derived the figure of $77,000 as the commuter service's proper share of indirect costs. 355 U. S., at 309–310, n. 8. It did not hold that in any consideration of revenue need the Commission must make findings in precise dollar amount, but that when it does make precise dollar findings as the basis for raising intrastate fares, it must explain how they were derived. Moreover, different issues are involved in an intrastate fare case and a rate divisions case, and in the former context this Court has noted that the Commission's exercise of its § 13 (4) power must be scrutinized "with suitable regard to the principle that whenever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear." *Florida* v. *United States,* 282 U. S. 194, 211–212. See also *Pub. Service Comm'n* v. *United States,* 356 U. S. 421, 425–426.

a greater need for investment funds than railroads elsewhere:

"We are unable to agree with the [Mountain-Pacific carriers] and [the regulatory commissions] that the public interest warrants increases in the divisions of the mountain-Pacific railroads in order to provide a source of investment funds required for enlarged facilities commensurate with industrial development in that region. The railroads in all sections of the country are faced with the continuing necessity of raising funds for additions and betterments and new equipment, and we cannot recognize any difference in the degree of this urgency among the territorial groups."

The appellees have sought to convince us that this finding is factually incorrect, but we decline to invade the administrative province and second-guess the Commission on matters within its expert judgment. *B. & O. R. Co.* v. *United States,* 298 U. S. 349, 359; *Alabama G. S. R. Co.* v. *United States,* 340 U. S. 216, 227–228.

The appellees also contend that the Commission erred in its treatment of passenger deficits. In discussing revenue needs, the Commission pointed out that since 1950–1952 the Mountain-Pacific carriers had enjoyed substantial increases in operating revenue from freight services, while the freight revenue of the Eastern carriers had declined. It also noted that the Midwestern carriers' freight revenues had remained relatively constant, and concluded that these comparative trends were likely to continue. The Mountain-Pacific carriers, however, complained that, despite their favorable trend in freight revenues and large amounts of new investment that they had recently made, their rate of return from all services had declined. In reply, the Commission observed that the Mountain-Pacific carriers' passenger deficits had increased

substantially since 1950–1952 and had offset their impressive performance in freight revenues.

The Mountain-Pacific roads now argue that the Commission's decision to increase the Midwestern divisions was based almost exclusively on its treatment of Mountain-Pacific passenger deficits. They further contend that this treatment was invalid on the grounds that it constituted unfair procedural surprise, that the statute does not permit the Commission to differentiate railroads' performance as freight carriers and passenger carriers when it assesses revenue needs in a freight rate divisions case, and that the Commission erred in assuming that, because their statistical passenger deficits had increased, the Mountain-Pacific carriers were capable of making a real improvement in their overall performance by reducing passenger service.

We regard the assumption that the Commission attached great importance to Mountain-Pacific passenger deficits in raising the Midwestern divisions as fanciful. As we have already noted, those increases were based exclusively or almost entirely on cost considerations. To the extent the Commission may have relied on comparative revenue needs, passenger deficits were not a significant factor. The discussion of passenger deficits in the Commission's original report occurred primarily in the context of comparing the revenue needs of the Mountain-Pacific carriers with those of the Eastern roads, when the Commission emphasized that the Eastern railroads had been much more successful in curbing losses on passenger service than the Mountain-Pacific carriers. Any error in the Commission's treatment of passenger deficits prejudiced the Midwestern as well as the Mountain-Pacific carriers, for in rejecting a Midwestern revenue needs argument in its supplemental report, the Commission noted that the Midwestern carriers had also done a much poorer job than the Eastern carriers in

halting the swell of passenger deficits. Furthermore, the Commission did not ignore the overall financial strength of the various groups of carriers, but found that the Mountain-Pacific carriers' rate of return from all services was substantially higher than that of either the Midwestern or Eastern carriers.

The claim of unfair surprise is strained in light of the fact that the Commission has frequently differentiated passenger and freight revenues in freight rate division cases.[28] While passenger deficits did not become an important issue in this case until the report of the Hearing Examiners was handed down, the Commission relied upon statistics which were matters of public record, and the Mountain-Pacific carriers had ample opportunity to debate the issue in their exceptions to the Hearing Examiners' report and their petitions for reconsideration of the Commission's original decision. And while the Commission has sometimes acted to offset passenger deficits in freight rate cases,[29] the issues are quite different when, in a divisions case, it is argued that carriers in one part of the country should subsidize the passenger operations of carriers elsewhere.

If the Commission were to give controlling weight to passenger deficits in a divisions case, it might be appropriate to take more evidence on the issue and discuss it in greater depth than the Commission did here. But in light of the fact that, in this case, passenger deficits were of negligible relevance to the Commission's decision to

---

[28] *Divisions of Freight Rates,* 148 I. C. C. 457, 474–475; *Atlantic Coast Line R. Co.* v. *Arcade & A. R. Co.,* 194 I. C. C. 729, 753, 755; *Southwestern-Official Divisions,* 216 I. C. C. 687, 698, 708; *Florida East Coast R. Co.* v. *Atlantic Coast Line R. Co.,* 235 I. C. C. 211, 236–237; *Official Western Trunk Line Divisions,* 269 I. C. C. 765, 772; *Gardner* v. *Akron, C. & Y. R. Co.,* 272 I. C. C. 529, 573–577.

[29] *E. g., Increased Freight Rates, 1948,* 276 I. C. C. 9, 35. See also *King* v. *United States,* 344 U. S. 254, 263–264.

increase the Midwestern divisions, we find no errors in the Commission's findings and procedure on this point that would justify setting aside its order.

## IV.

Rejection of the appellees' attacks on the Commission's treatment of revenue needs does not exhaust their arsenal. For they argue that the Commission's findings on costs, which were the basis of its decision to raise the Midwestern divisions, were also infected with serious error.

All are agreed that the relevant costs are those of the Eastern-Transcontinental and Midwestern-Transcontinental freight traffic to which the divisions apply. But throughout the proceedings there has been sharp dispute as to the proper method of ascertaining these costs. At the beginning of the administrative hearings, the Midwestern and Eastern carriers relied principally on the Commission's standard Rail Form A, a formulation based on average freight data which, as the Commission noted, "has been widely used as an acceptable means of comparing relative transportation costs." The Mountain-Pacific carriers took the position that Rail Form A, based on averages of all freight service, was not a proper yardstick for measuring the costs of the particular traffic involved in the contested divisions, which, they maintained, had certain distinctive characteristics. The Mountain-Pacific roads prepared their own cost system, based upon a study of this traffic. The Midwestern and Eastern lines responded with other material, and the Midwestern carriers conducted their own special study of line-haul services. Disputes over the applicability of Rail Form A and the various approaches urged by the parties occupied a large part of the administrative proceedings. As the Commission observed:

> "The evidence pertaining to the cost studies of the [Mountain-Pacific carriers] and the midwestern lines

was extensive. In addition to the detailed testimony of the cost analysts who planned the studies and supervised their compilation, evidence was presented by many other witnesses concerned with operating, statistical, engineering, and mathematical aspects of the projects. In criticism of the studies the [Eastern carriers] and the midwestern lines also introduced detailed evidence of the same general nature and considerable bulk."

After carefully considering this evidence, the Commission decided to base its cost findings on the special cost study and analysis prepared by the Mountain-Pacific carriers. However, it made certain adjustments in the Mountain-Pacific analysis which, in the judgment of the Commission, more accurately reflected the true costs of the traffic involved.

The Commission substituted its own ratio for empty-car returns, derived from Rail Form A, for that devised by the Mountain-Pacific carriers. It summarized its reasons for this choice in its supplemental report:

"It is difficult to ascribe the empty movement of a car to a particular commodity or class of traffic because of the variety of the lading, and the fact that cars used occasionally for hauling transcontinental traffic may at other times serve widely different uses, including local movements within each territory . . . . The defendants urge that insufficient consideration was given to special cars . . . . They would be included in [Rail Form A] tending to increase the empty-return ratios in all territories. Here they accounted for only about 4 percent of the total movement . . . .

"Many special studies of empty-return movement were undertaken in these proceedings, each showing a different result. The deficiencies in the [Mountain-

Pacific carriers'] studies of general-purpose boxcar empty return . . . are so serious in our opinion as to render them without value. We adhere to our prior finding that the 7-day studies made under an order of the Commission and based on uniform instructions to all the railroads as to how the studies were to be made, afford a more reliable basis of comparison among territories. Moreover, on the basis of the evidence in this record, the 7-day studies provide appropriate comparative ratios to the traffic in issue."

The Commission also disagreed with the Mountain-Pacific study's treatment of the "constant cost" element of road costs—that which is unrelated to volume of traffic. It found the accounting methods used to distribute these costs in Rail Form A to be more accurate. The Mountain-Pacific roads claimed that this method unduly favored the Midwestern lines by improperly ascribing the maintenance costs of branch and light-density main lines to the cost of their transcontinental traffic. The Commission, however, found that the evidence showed:

"[T]hat the proportion of branch line mileage for each group is almost the same and the amount of traffic on branch lines is so small that some other factors cause the lower unit cost in mountain-Pacific territory. The principal factor is clearly the high density of traffic, 76 percent higher than the Midwest.

"Although the cost per mile may be somewhat higher in mountainous territory, this higher cost is shared by so many more tons of traffic that the cost per ton-mile is lower.

"It is the light density on the main lines in the Midwest which causes [their] higher costs. These

lines are used by bridge traffic, and it is, therefore, quite correct to charge this bridge traffic with its proportionate share of maintaining the lines over which it moves."

The Commission made certain adjustment in the basis for determining locomotive costs; the Mountain-Pacific carriers' objections to this adjustment were directed at the Commission's reliance on differences it found between engine districts in Eastern Territory and those elsewhere. Any error in this adjustment is thus relevant only to the Eastern divisions, which are no longer in issue. The Commission also substituted Rail Form A treatment of car service costs, after finding that the Mountain-Pacific study ignored actual territorial differences in this item. Again, this issue related only to the Eastern divisions. In ascertaining the cost attributable to equipment used in the service at issue, the Commission chose a 4% rate of return on investment, a figure traditionally employed by it for this purpose, rather than the 6% figure urged by the Mountain-Pacific carriers. And, in harmony with its treatment of revenue needs, the Commission chose its standard value basis to measure the investment involved, rather than the book cost used by the Mountain-Pacific study.[30]

From the Mountain-Pacific cost study, as adjusted in these particulars, the Commission found that the Mountain-Pacific carriers enjoyed a much higher margin of revenue over costs than did the Midwestern carriers, and for this reason prescribed increases in the Midwestern divisions.

---

[30] Also, when as little as 50% of the traffic on a branch line was in some way related to interterritorial service, the Mountain-Pacific study charged 100% of the expenses of the branch to the cost of the latter service. The Commission's rejection of this technique was not challenged in the District Court.

In the proceedings before the District Court, the Mountain-Pacific carriers generally attacked the adjustments made by the Commission in their cost study, claiming that their approach more accurately reflected the costs involved. They particularly maintained that the Commission should have forced the Eastern and Midwestern carriers to produce evidence on empty-car return ratios on the same basis that the Mountain-Pacific carriers had used in their cost study. The Midwestern carriers, however, had come forward with specific empty-return data, and the Commission also observed that:

> "In the prehearing conference in the instant cases the advisability of instituting an overall general investigation was discussed but the [Mountain-Pacific carriers] opposed the suggestion, and the matter was dropped. . . . Nor do we see in the record any basis for assuming that the eastern and midwestern complainants withheld vital evidence merely because they had different conceptions of the nature and extent of facts to be developed."

The Mountain-Pacific carriers also contended that certain factual premises on which the Commission based its allocation of road maintenance costs were erroneous, and that there was no foundation for the Commission's choice of a value basis for investment rather than book cost.

The District Court did not directly deal with these contentions, stating rather cryptically that in light of its conclusions on the revenue needs issues, "it is unnecessary to discuss [the cost issues]. However, no inference is to be drawn that the court is of the opinion that the [cost issues], or any other numbered issues not discussed in this opinion, are of the nature it would be required to decide should they be raised at some future time." [31]

---

[31] 238 F. Supp., at 540.

The appellees argue that since the District Court failed to pass on the cost issues, we are precluded from doing so. It is true that we have occasionally stated that it is not our general practice "to review an administrative record in the first instance." *United States* v. *Great Northern R. Co.*, 343 U. S. 562, 578; *Seaboard Air Line R. Co.* v. *United States*, 382 U. S. 154, 157. But we think that policy is not applicable on the facts of this case. The presentation and discussion of evidence on cost issues constituted a dominant part of the lengthy administrative hearings, and the issues were thoroughly explored and contested before the Commission. Its factual findings and treatment of accounting problems concerned matters relating entirely to the special and complex peculiarities of the railroad industry. Our previous description of the Commission's disposition of these matters is sufficient to show that its conclusions had reasoned foundation and were within the area of its expert judgment. *B. & O. R. Co.* v. *United States*, 298 U. S. 349, 359; *New York* v. *United States*, 331 U. S. 284, 328, 335, 349. Thirteen years have elapsed since the complaints in this case were first filed. The appellees' attacks on the legal validity of the Commission's findings on cost are so insubstantial that no useful purpose would be served by further proceedings in the District Court. We conclude that there was no legal infirmity in the Commission's cost findings.

## V.

The Commission devised a special divisional scale, adapted to the particular circumstances of this case and designed to produce the moderate overall increases in the Midwestern divisions that it found justified by the evidence relating to cost of service. Appellees contend that the Commission did not sufficiently explain its choice of new divisions, that the divisions are not justi-

fied by the evidence relating to cost, and that the Commission was required to find the exact revenue effect of the new divisions in precise dollar amount. None of these contentions has sufficient merit to warrant setting aside the Commission's order.

In discussing its choice of the modified 29886 divisional scale, the Commission stated:

> "Although broad groups are now employed in connection with the divisions of rates between midwestern and transcontinental territories, they are less well defined than those on which the [Eastern-Transcontinental] divisions are based, and in a number of instances they appear not to be properly related to distance. The midwestern lines urge that in lieu of prescribing new [Midwestern-Transcontinental] divisions on a group basis we should formulate scales of divisional factors and authorize the two groups of carriers to apply these to groups agreed upon by them. The defendants apparently are not opposed to that course. In our opinion divisional scales afford an appropriate means of readjusting the [Midwestern-Transcontinental] divisions, and the possibility of such use was discussed extensively in the record."

The Commission then rejected certain divisional scales urged by the Mountain-Pacific lines on the ground that they were not justified by the evidence on cost of service. However, it found that the 29886 scale, which had been discussed by a witness for the Mountain-Pacific carriers, and which the Commission had employed previously, could be adapted for use in this case after adjustments were made to reflect certain Mountain-Pacific costs:

> "Consistency with our action in prescribing intra-territorial class rates for mountain-Pacific territory

higher than those in the rest of the country . . . makes it logical to provide a higher scale of divisional factors for that territory here, but a difference of more than 10 percent would not be justified in our opinion. The scales shown in appendix C reflect that difference. They would produce moderate increases in some of the most important midwestern divisions."

*Burlington Truck Lines* v. *United States,* 371 U. S. 156, relied upon by the appellees, is thus inapposite. In that case the Court stressed that there were "no findings and no analysis" to justify the Commission's choice of remedy, "no indication of the basis on which the Commission exercised its expert discretion." 371 U. S., at 167. See also *Gilbertville Trucking Co.* v. *United States,* 371 U. S. 115, 129–131. Here the Commission explained why it had resorted to divisional scales and why it modified the familiar 29886 scale; it found that the modified scale would produce divisions appropriate to its cost findings. The Commission's "expert discretion" has a considerable role to play in so technical a matter as railroad rate divisions, and there was sufficient explanation of its exercise in this case. *Alabama G. S. R. Co.* v. *United States,* 340 U. S. 216, 227–228; *Board of Trade* v. *United States,* 314 U. S. 534, 548.

Appellees claim that if the changes in divisions were based on costs, the Commission was required to start from scratch and construct the new divisional scale directly from cost data. In their view, a scale like that used by the Commission in this case, constructed on a weighted mileage basis and adjusted to reflect comparative costs, is *per se* invalid. We cannot impose such mechanical restrictions on the range of remedies from which the Commission may choose. It is true that in a more recent territorial divisions case, involving Eastern and Southern Territories, the Commission did establish a

divisional scale constructed directly from costs.[32]   But the two methods of constructing divisional scales are merely alternative mechanisms for dividing rates in conformity with the evidence.[33]   What is appropriate in one case may be inappropriate in another, and the fact that the Commission may, in the light of accumulating experience, devise new remedial techniques does not make the ones that it formerly employed unlawful.[34]   It is also true that the changes produced by the new scale were not the same for every existing division.   Some of the particular Midwestern divisions were increased more than others, and a few were actually reduced.   But that is only to be expected when a uniform scale is substituted for divisions produced by negotiation between the several carriers, and especially when, as the Commission found, the existing divisions were based on subgroupings that were not well-defined.   Cf. *Beaumont, S. L. & W. R. Co.* v. *United States,* 282 U. S. 74, 86–88.   The Commission's cost findings dictated moderate overall increases in the Midwestern divisions; the remedy it chose was appropriately calculated to achieve that result.

The District Court held that the Commission was required to find the exact effect, in precise dollar amount, of the new divisions on the revenues of each of the 300 carriers involved in the Commission proceedings.   The appellees also contend that the Commission was obliged

[32] *Official-Southern Divisions,* 325 I. C. C. 1, 449.   The parties in that case specifically requested a cost-constructed scale.

[33] See *Beaumont, S. L. & W. R. Co.* v. *United States,* 36 F. 2d 789, 799.   This Court has never suggested that there was legal infirmity in divisional scales constructed on a basis similar to that employed by the Commission in this case. *Beaumont, S. L. & W. R. Co.* v. *United States,* 282 U. S. 74; *B. & O. R. Co.* v. *United States,* 298 U. S. 349; *Boston & Maine R. Co.* v. *United States,* 371 U. S. 26, affirming 208 F. Supp. 661.

[34] *Georgia Comm'n* v. *United States,* 283 U. S. 765, 775.   See also *Virginian R. Co.* v. *United States,* 272 U. S. 658, 665–666.

to make such findings, at least with respect to the various carrier groups involved. These views stem from the same misconception of the Commission's decision that we have already dealt with in the discussion concerning revenue needs. The Commission did not undertake to transfer lump sums of money from the Mountain-Pacific carriers to the Midwestern roads in order to meet certain defined revenue needs of the latter carriers. If it had, there might be more substance to these contentions. But, even in such a case, all the details of the divisions' actual operation might be difficult to foresee, and precise calculation impossible. It is also dubious whether any useful regulatory purpose would be served by such a rigid requirement, which this Court has never imposed in the past.[35] In any event, the Commission's action in this case was based not on revenue needs, but cost of service, and it found that the divisions which it established would produce moderate overall increases in the shares of the Midwestern group, in accord with its cost findings. None of the figures, charts, or tables concocted by the appellees convinces us that this determination was not based upon substantial evidence. *Alabama G. S. R. Co.* v. *United States,* 340 U. S. 216, 227–228.

Finally, the Mountain-Pacific carriers quarrel with the Commission's prescription of a minimum division of 15%. They contend that the evidence pertaining to terminal costs and standby costs that a participating railroad must incur regardless of the length of its carriage does not justify so high a minimum division. But the Commission found that: "Both in many divisional bases voluntarily established in the past and as well in our decisions it has been common practice to accord minimum divisions for carriers having relatively short hauls, sometimes as high as 20 or 25 percent but more usually 15 percent.

---

[35] See nn. 26 and 27, *supra,* and accompanying text.

The increasingly burdensome terminal costs in recent years are persuasive that a 15-percent minimum is justified." We cannot find that the Commission exceeded its proper role in weighing and interpreting the evidence when it made this finding. *B. & O. R. Co.* v. *United States,* 298 U. S. 349, 359. For similar reasons, we also reject the Mountain-Pacific carriers' criticism of the weight assigned to the first 50 miles of carriage in the Commission's divisional scales.

## VI.

The appellees finally contend that the Commission erred in its treatment of a single Mountain-Pacific carrier, the Denver & Rio Grande, and two Midwestern carriers, the Katy and the Frisco. It is argued that the situation of these three carriers was dissimilar to that of the groups with whom they were considered, that the typical evidence rule of the *New England Divisions Case* was inapplicable, and that the Commission was therefore required to make separate findings concerning these carriers. The appellants point out that these carriers voluntarily aligned themselves with their respective groups, presented evidence and argued the case on that basis, and never suggested that they should receive separate treatment until after the Commission's original decision. They argue that the Commission should not be required, on its own motion, to guess which of 300 carriers may require individual treatment when none of them even requests it. Cf. *United States* v. *Tucker Truck Lines,* 344 U. S. 33, 37. The District Court resolved these contentions by stating that "there has been no intentional relinquishment of a known right on the part of any of these roads." [36] This language is more appropriate to a criminal trial than an administrative proceeding.

---

[36] 238 F. Supp., at 539.

Reconciling the need for efficient regulatory adjudication with fairness to the parties and due concern for the public interest is a different, and difficult, problem.

But we need not undertake to resolve this problem in all its broad ramifications. The contentions made on behalf of the three individual carriers are basically quite limited. It is not argued that the Commission erred in generally treating them on a group basis and not making individual findings on their costs and revenue needs. The basic claim is that the divisions prescribed by the Commission have an unfair and unduly harsh impact on these individual carriers.

The Katy and the Frisco claim that the new divisions will result in a net decrease in their revenue shares; while many of their divisions were increased under the Commission's order, some highly profitable divisions that they had negotiated with respect to lumber carriage were reduced. The Commission found that this situation "was fully disclosed in the evidence of the midwestern lines and foreshadowed in the examiners' recommended report. The petitioners are therefore not in a position to claim that the effect of our decision was a surprise." But more than procedural grounds justify rejecting the tardy claims of the Frisco and the Katy for separate treatment. The Act does not give any carrier a vested right to divisions that it may have negotiated. It does not recognize prescriptive privileges, but requires the Commission to establish "just, reasonable, and equitable divisions." The mere fact that the new divisions may have caused a net reduction in the revenues of two Midwestern carriers while raising those of other Midwestern carriers does not establish the invalidity of the new divisions. For the high divisions on lumber previously negotiated by these two roads may have been far in excess of their cost of service. The Katy and the Frisco have not shown that the new divisions do not

fairly reflect their cost of service. The Commission was justified in stating that "[w]e see no reason for making a special exception from our findings" for them.

Moreover, the losses claimed by the Frisco and the Katy were based primarily on the new divisions' effect in apportioning revenues between themselves and the Mountain-Pacific carriers. But this aspect of the case is no longer in issue, because the Katy and the Frisco have settled with the Mountain-Pacific carriers and agreed on negotiated divisions. Thus, the Commission's divisions affect the Katy and the Frisco only insofar as they must divide revenues with other Midwestern carriers on service in which they jointly participate. The Katy and the Frisco are silent as to the effect on their revenues of the new divisions operating in this much more limited respect. We may assume that the losses produced, if any, are small.

The Denver & Rio Grande also complains of reductions in its revenues caused by the new divisions. Since it is one of the Mountain-Pacific carriers, whose existing divisions the Commission found too high in terms of cost of service, some reduction was of course to be expected. But the Denver & Rio Grande states that its competitive and geographical situation is such that it must bear a disproportionate share of the reductions in the Mountain-Pacific divisions, with allegedly disastrous effects on its net income.

The Rio Grande participates in transcontinental service between Utah gateways (Ogden and Salt Lake City) and Denver and Pueblo, Colorado, on the border of Mountain-Pacific Territory. There it interchanges with Midwestern carriers who provide service to the Missouri River and beyond. The Union Pacific operates entirely by itself a competitive route between Utah and Missouri River gateways. Both the Union Pacific and the Rio Grande accept traffic at the Utah gateways from the

Western Pacific and the Southern Pacific. The Commission's divisions break at the border of Mountain-Pacific territory, at the Colorado junctions, but do not provide for any subdivisions in Mountain-Pacific territory. The Rio Grande complains that, as a result, it must bear the whole reduction in the Mountain-Pacific divisions. Its competitor, the Union Pacific, is unaffected by the new divisions because it operates in both Mountain-Pacific and Midwestern territory and does not, insofar as relevant here, interchange with Midwestern carriers. The Rio Grande contends that the Southern Pacific and Western Pacific will not accept divisions from it lower than they obtain from the Union Pacific, and thus it will be squeezed. It alleges that it will lose $8,500,000 as a result, and that its net income is only $10,500,000.

Divisions over these competing Utah-Missouri River routes were equalized under the existing system. In the Commission proceedings, the Midwestern carriers urged that these routes also be equalized under the new divisions. However, this would require the Commission to establish subdivisions in Mountain-Pacific territory east and west of the Utah gateways, and the Mountain-Pacific carriers, including the Rio Grande, resisted this proposal on the ground that it was outside the issues raised by the pleadings. If the Rio Grande's description of its competitive situation is accurate it was obvious, from at least the time of the examiners' recommended report, that it would bear most or all of the reductions in the Mountain-Pacific divisions unless the Commission prescribed subdivisions within Mountain-Pacific territory. Nevertheless, it joined the other Mountain-Pacific lines in stating to the Commission that:

"The Midwestern lines ask that the Commission fix divisions over Utah gateways, not served by any

Midwestern line, in the interest of equalizing competing routes. . . . In dealing with this contention, two considerations must be sharply differentiated. The first is the general desirability of equalizing divisions; the Mountain-Pacific lines agree that the parties should be free to equalize divisions over competitive routes . . . . But a very different question is raised when the Midwestern lines ask the Commission to prescribe divisions over gateways 500 miles inside Mountain-Pacific territory and served only by Mountain-Pacific lines. Such a prescription is beyond the issues of the complaints before the Commission in this proceeding."

In rejecting the belated claims made by the Mountain-Pacific carriers on behalf of the Rio Grande, the Commission was justified in concluding that: "The midwestern complainants are correct in stating that the 'problem is left precisely where the transcontinental defendants insisted that it be left.' We therefore see no reason for the modification of our findings sought by the defendants."

Of course, the Commission could not simply rest on such notions of estoppel to justify infliction of substantial injury upon an important railroad serving the public. But it was not at all clear at the time of the Commission's decision, and it is still not clear, that the new divisions will have the disastrous or unfair effects alleged by the Rio Grande. The revenue effect on the Rio Grande hinges, in important part, on the subdivisions it is able to negotiate with the other Mountain-Pacific carriers. The Mountain-Pacific carriers, including the Rio Grande, urged the Commission to permit such voluntary negotiation in the first instance before taking action itself.[37] The Commission acceded to this request by spe-

---

[37] After the examiners' recommended report, the Mountain-Pacific carriers told the Commission that: "Any legitimate concern the

cifically providing in its orders that the carriers involved were free to negotiate divisions to equalize competitive routes between gateways. Thus at the time of the Commission's decisions, the impact of the new divisions on the Rio Grande's revenues was speculative and uncertain, and voluntary negotiation of subdivisions was available. It could be assumed that the actual reduction in the Rio Grande's revenues might turn out to be no greater than that of the other Mountain-Pacific carriers. In these circumstances, the Commission was not required to rearrange the foundations of a decision that had been reached after long years of proceedings and affected 300 carriers, nor was it required to embark on new hearings to deal with the Rio Grande's claims.

It now appears that the impact of the new divisions may in fact be much less severe than the Rio Grande feared. The Midwestern appellants have cited evidence tending to show that the reduction in its revenue is more like $850,000 than $8,500,000. We, of course, do not resolve this issue. But we do think that the Commission was justified in refusing plenary consideration of the Rio Grande's claims in 1963. If the Commission's new divisions, in connection with the subdivisions that the Rio Grande is able to negotiate with its fellow Mountain-Pacific carriers, do have an impact on the Rio Grande that is unfairly disproportionate or so severe that the Rio Grande's ability to provide service is jeopardized, the Rio Grande may apply to the Commission for relief. There is no reason to suppose that relief will

Midwestern lines may have in any threat to the equalization of divisions over Utah gateways is premature. If any problems arise as to equalization of divisions over those gateways on a fair and equitable basis, they can be considered in the negotiations contemplated in the Recommended Report."

not be promptly forthcoming if the Rio Grande's claim is meritorious.[38]

We conclude as did the Court in the *New England Divisions Case:*

> "To consider the weight of the evidence, or the wisdom of the order entered, is beyond our province. . . . But the way is still open to any carrier to apply to the Commission for modification of the order, if it is believed to operate unjustly in any respect." 261 U. S., at 204.

## VII.

We hold that the Commission's original and supplemental orders are valid, and that the District Court erred in setting them aside. When it entered interlocutory injunctions against these orders, the District Court imposed certain protective conditions. They provided that if the Commission's orders were eventually upheld, they would be deemed effective as of July 1, 1963, and March 30, 1964, respectively, and the various carriers would be required to resettle the interim revenues they received in accordance with the divisions established in the orders. Pending appeal of its final decision to this

---

[38] In *Official-Southern Divisions,* 325 I. C. C. 449, 450, the Commission stated:

"To avoid serious injustice to any carrier, our procedures permit any railroad to be excepted from a group order, in whole or in part, on a proper showing of differing circumstances. Where it is demonstrated by competent and reliable evidence that a carrier's financial or revenue needs situation requires the preservation of its share of the joint rates on the same level as presently existing or at a level different than that to be maintained for the group as a whole, we may provide special individual treatment in order to maintain such carrier as part of the Nation's transportation system without regard to its costs of rendering the service."

Court, the District Court stayed execution of its judgment permanently setting aside the Commission's order and remanding the case to the Commission; with the consent of the parties, it also provided that these protective conditions should be continued in effect. The Commission has required the carriers involved to adopt certain accounting procedures designed to facilitate the eventual implementation of these protective conditions. Since we now uphold the validity of the Commission's orders, it will be necessary for the District Court, with such assistance from the Commission as seems appropriate, to supervise resettlement of revenues in accordance with its protective conditions. The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*